JOSEPH DOEHRER *v.* COMMISSIONER OF
CORRECTION
(AC 20865)

Lavery, C. J., and Foti and Schaller, Js.

Argued January 15—officially released March 26, 2002

*David R. Kritzman,* for the appellant (petitioner).

*Angela R. Macchiarulo,* assistant state's attorney, with whom, on the brief, was *James E. Thomas,* state's attorney, for the appellee (respondent).

*Opinion*

FOTI, J. The petitioner, Joseph Doehrer, appeals from the judgment of the habeas court denying his petition

for a writ of habeas corpus. The petitioner claims that the court improperly (1) concluded that he had failed to establish that he was denied effective assistance of counsel and (2) failed to credit the testimony of his expert witness and improperly assessed the credibility of witnesses. We affirm the judgment of the habeas court.

In November, 1983, the petitioner was convicted of murder, assault in the first degree and assault in the second degree with a firearm. He was sentenced to a total effective sentence of eighty-five years imprisonment. Our Supreme Court affirmed the judgment of conviction in *State* v. *Doehrer*, 200 Conn. 642, 513 A.2d 58 (1986).

The petitioner thereafter filed a petition for a writ of habeas corpus, and the court conducted proceedings related thereto. The court denied the petition, concluding that the petitioner had failed to establish that his trial counsel's performance was deficient,[1] and granted the petitioner's petition for certification to appeal.

The facts underlying the petitioner's conviction are set forth in *State* v. *Doehrer*, supra, 200 Conn. 643–45, and are as follows: "There was no dispute at trial that Barry Antoni was killed by the [petitioner] on February 24, 1983. The event which precipitated the death of Barry Antoni was an incident that occurred between Patricia Antoni, the decedent's sister, and the defendant at the apartment of a mutual acquaintance, Patrick Lyons. The evidence adduced at trial established that Patricia had gone to Lyons' apartment about one and one-half weeks prior to the shooting to purchase cocaine. While at the apartment, she attempted to steal two grams of cocaine from Lyons and to leave the

---

[1] Having so concluded, the court, which conducted the trial in a bifurcated manner at the petitioner's request, did not reach the issue of whether the conduct of the petitioner's counsel caused prejudice to the petitioner.

apartment without paying him for the cocaine she had consumed while there. At that point Lyons threatened her and telephoned the defendant and another man, Eugene Jarvis. When they arrived, the defendant pointed a gun at Patricia and the men inquired as to the whereabouts of the missing cocaine. Although Patricia was then too frightened to admit the attempted theft, the cocaine was eventually found where she had hidden it earlier. The defendant warned Patricia that if she reported the incident to the police, they would kill her and her family.

"Patricia testified that the defendant telephoned her several days after the apartment incident to ask whether she had paid Lyons for the cocaine she had used. The defendant suggested a meeting, which subsequently took place, to discuss the use of Patricia's Econoline van to transport stolen goods to New York. The next time Patricia saw the defendant was the night before her brother's death. On that evening, she accompanied the defendant and Jarvis to the apartment of the defendant's brother, where a small group had gathered for music and also to use alcohol and drugs. After the defendant had taken Patricia home, a one hundred dollar bill was believed missing from the apartment. There was some evidence that the individuals at the party wrongly suspected Patricia of the theft. Although the bill was later found, the defendant was not aware of this fact when he went to the Antoni residence the following evening.

"On February 24, 1983, at about 6 p.m., Patricia, while home at the Antoni residence in Orange, Connecticut, received a telephone call from the defendant. In response to his statement that he might stop over, Patricia told the defendant not to come because her parents had visitors, but to call back in an hour. About an hour later, Barbara Antoni, the decedent's mother, heard a knock at the front door. As she was opening the door,

the defendant and his companion Jarvis pushed their way into the house. The defendant grabbed Barbara Antoni and held a gun to her head. When she screamed, her husband, Cleto Antoni, and her son Barry emerged from rooms in the upper level of the house and ran downstairs. The defendant shot Barry, mortally wounding him, and then proceeded to shoot Cleto, hitting him in the lower abdomen. During the commotion, Jarvis struck Barbara Antoni, causing her to fall backwards to the floor. By this time, Patricia had ascended the stairs from the lower level of the house and entered the hallway. She screamed at the defendant, 'Why are you doing this? Why are you here? What's going on?' The defendant replied that it was because she had stolen his money. He then pointed a gun at her and fired, hitting her in the arm. At this point, the defendant and Jarvis fled the scene."

Before addressing each of the petitioner's claims of ineffective assistance of counsel, we set forth our standard of review. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary." (Internal quotation marks omitted.) *Henry* v. *Commissioner of Correction*, 60 Conn. App. 313, 316, 759 A.2d 118 (2000).

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel . . . . In *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the United States Supreme Court established that for a petitioner to prevail on a claim of ineffective assistance of counsel, he must show that counsel's assistance was so defective as to require reversal of [the] conviction . . . . That requires the petitioner to show (1) that counsel's performance was deficient and (2) that the deficient performance preju-

diced the defense. . . . Unless a [petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable. . . .

"The first component of the *Strickland* test, generally referred to as the performance prong, requires that the petitioner show that counsel's representation fell below an objective standard of reasonableness. . . . In *Strickland,* the United States Supreme Court held that [j]udicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a [petitioner] to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense, after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . [C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. . . . *Minnifield* v. *Commissioner of Correction,* [62 Conn. App. 68, 71–72, 767 A.2d 1262, cert. denied, 256 Conn. 907, 772 A.2d 596 (2001)].

"Even if a petitioner shows that counsel's performance was deficient, the second prong, or prejudice prong, requires that the petitioner show that there is a reasonable probability that, but for counsel's unprofes-

sional errors, the result of the proceeding would have been different. . . . Therefore, [a] habeas court deciding an ineffective assistance of counsel claim need not address the question of counsel's performance, if the claim may be disposed of on the ground of an insufficient showing of prejudice." (Citations omitted; internal quotation marks omitted.) *Goodrum* v. *Commissioner of Correction*, 63 Conn. App. 297, 299–301, 776 A.2d 461, cert. denied, 258 Conn. 902, 782 A.2d 136 (2001).

Mindful of those standards, we now examine each of the petitioner's claims. Additional facts will be set forth as necessary to resolve the claims.

I

The petitioner first claims that his criminal trial attorney, Howard I. Gemeiner, was ineffective in representing him at his criminal trial in that he failed (1) to make an effective effort to retain an expert witness to support the theory of defense that the petitioner was legally insane or suffering from an extreme emotional disturbance at the time of the crimes, (2) to provide C. Scott Grove, a psychiatrist who had examined the petitioner prior to trial for the purpose of developing possible defenses based on the petitioner's state of mind, with sufficient background information and documentation of the petitioner's mental history and mental state at the time of the offenses, (3) to communicate with Grove and ascertain his professional opinion regarding whether the petitioner was suffering from a mental disease or defect or extreme emotional disturbance, (4) to introduce into evidence at trial Grove's testimony or the testimony of another competent mental health professional in support of the petitioner's claim that he was suffering from a mental disease or defect or extreme emotional disturbance at the time of the offenses, (5) effectively to investigate the availability of other witnesses who were with the petitioner during

the period leading up to and at the time of the commission of the offenses and who could support the petitioner's claim that he was suffering from a mental disease or defect or extreme emotional disturbance, (6) effectively to introduce into evidence at trial the testimony of other witnesses who were with the petitioner during the period leading up to and at the time of the commission of the offenses to support the petitioner's claim that he was suffering from a mental disease or defect or extreme emotional disturbance and (7) effectively to argue to the jury in his summation that the petitioner was suffering from a mental disease or defect or extreme emotional disturbance at the time of the offenses.

At the hearing before the habeas court, the petitioner elicited testimony from Gemeiner, Grove and William Paetzold, an attorney who testified as an expert in criminal defense representation.

The court described the evidence presented during the habeas proceeding as follows: "Gemeiner testified that when he represented the petitioner in 1983 he had fourteen (14) years of practice, mostly at the felony criminal level with about ten (10) trials through verdict, but the petitioner's case was the first murder case tried to verdict. He had had two (2) other murder cases which, by preparation of the extreme emotional disturbance defenses, had been plea bargained for manslaughter. The state had a strong case because the petitioner had intruded with another into the victim's home where he shot three (3) family members, killing one of them. His dispute was with Patty Antoni, whom he believed stole his brother's $100 while visiting with the petitioner in his brother's apartment. Patty's brother was killed, her father was shot in the abdomen, and Patty was shot in the arm and breast. Because the state appeared not to be interested in plea bargaining, he explored state of mind defenses by requesting an exami-

nation by Dr. C. Scott Grove, a psychiatrist. The petitioner was articulate and bright as well as charming, although with little formal education, and therefore he was optimistic that the defense of extreme emotional disturbance might be available to reduce the murder charge to manslaughter. However, Dr. Grove called him to tell him that the petitioner was not suffering from extreme emotional disturbance, but was 'evil to the core' or 'evil incarnate,' and that he was a cold-blooded killer and that 'you don't want my report and you don't want me to testify.' He decided that the case was going nowhere, but he had to go forward with the extreme emotional disturbance defense with the petitioner testifying about his criminal background from a dysfunctional family of an alcoholic father and a mother with emotional problems for which she was institutionalized. The petitioner had recently lost his girlfriend and a buddy by suicide, and was beset by substance abuse. [Gemeiner] hoped the petitioner could come across to the jury with enough sympathy to gain the lesser charge of manslaughter. Obviously, it failed. . . . He felt he had no choice, since [the trial judge] was known as a conservative judge who imposed the maximum penalty.

"After the verdict, Gemeiner contacted Dr. Grove to obtain a written report to see if there was something he could use for the sentencing. He was shocked when he received the report dated December 9, 1983 . . . . Dr. Grove's oral telephone report had been consistent with the facts Gemeiner had in evaluating the petitioner. The petitioner had told him that while shooting in the Antoni home, the gun jammed and had it not, he would have shot them all. The petitioner also responded to Gemeiner's question [as to whether] he had killed someone before, [stating,] 'don't ask me that question.' Now, Dr. Grove's report contains no language of an opinion that he is a 'cold-blooded killer,' but '[t]he issue of [the petitioner] having been suffering from an 'extreme

emotional disturbance' at that time presents problems. Although the clinical evidence I obtained was not compellingly convincing, it was nevertheless too strong to be ruled out. Unfortunately, I do not believe that further examination of this man would reveal enough clinical evidence to prove the point one way or the other; this evidence is inaccessible at this time.' Gemeiner said he felt bagged. Had he been told this before the trial was over, he would have sought a second opinion.

"Paetzold testified that where his client has been referred to a psychiatrist who cannot give a beneficial opinion, he will seek a second opinion. He felt that Dr. Grove's examination came too late to adjust to find another professional. Whereas here the evidence was overwhelming for the state's case and no favorable state of mind expert, he would consider his client as a witness with other state of mind evidence.

"Dr. Grove testified that he does not know when he was first contacted by Gemeiner, but he usually sees the patient within three to four weeks. His original practice consisted of such evaluations being requested by the defense amounting to 75 percent of the total to 25 percent by the state. It gradually increased in requests by the state until this year the only requests for evaluations were by the state.

"The only dates he is positive of is the interview date of October 14, 1983, when he spent two and one-half hours in his interview of [the petitioner] and December 9, 1983, the date of his report. Considering his normal practice, he would have reviewed the material submitted to him on the day before the interview and called two days after the interview with an oral report, and he would have prepared his report the day prior to its date. He cannot account for the time delay of the report after the interview. He identified . . . his report and acknowledged that he was unable to determine one

way or the other whether [the petitioner] suffered an extreme emotional disturbance on February 24, 1983. He claimed that he did not use such terms as 'pure evil,' 'evil incarnate' or 'cold-blooded killer,' which are vitriolic terms, not professional terms. He would have told Gemeiner exactly what was in the report."

As part of its fact-finding function, the court found that "there is nothing discrediting Gemeiner's testimony." In contrast, it further found that "Grove leaves too many holes to make his testimony credible." Further, the record reflects that Paetzold, who testified in this case for the first time as an expert witness, based his opinion testimony solely on information given to him by the petitioner. Paetzold could not explain why he believed that Gemeiner should not have relied on Groves' medical opinion.

It is not disputed that Gemeiner was faced with overwhelming evidence against the petitioner at trial and that the state was not willing to offer the petitioner a lesser sentence in exchange for a guilty plea. Under those circumstances, Gemeiner's only possible defense would be based on insanity or extreme emotional disturbance. Grove did not render a diagnosis in support of either defense. Gemeiner was justified in relying on Grove's conclusions and did not see a benefit in retaining a second psychiatrist. Because there was nothing unreasonable about Gemeiner's reliance on the unfavorable evaluation results provided by Grove, who did not suggest that Gemeiner seek a second opinion, we are unable to conclude that Gemeiner's conduct in that regard was ineffective.

On the basis of the foregoing facts and judged under the standard set forth in *Strickland,* we are unable to conclude that Gemeiner's representation was deficient in any of the seven aspects that the petitioner alleged in his petition.

## II

The petitioner also claims that the court improperly failed "to credit the uncontradicted testimony of [his] expert witness" and that its "assessment of credibility of witnesses was clearly erroneous." Those claims are without merit.

We reiterate the standard of review that applies to that aspect of the appeal. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous . . . ." (Internal quotation marks omitted.) *Jackson* v. *Commissioner of Correction*, 68 Conn. App. 190, 192, 791 A.2d 588 (2002). This court does not retry the case or evaluate the credibility of witnesses. "Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *Logan* v. *Commissioner of Correction*, 68 Conn. App. 373, 376, 791 A.2d 638 (2002).

The petitioner acknowledges that the habeas court was not required to accept as true uncontradicted expert testimony; *State* v. *Blades*, 225 Conn. 609, 629, 626 A.2d 273 (1993); but argues that this is one of those rare cases in which the court, despite its superior vantage point, has erred in its assessment of the testimony. He argues that because Paetzold testified that Grove had stated that an extreme emotional disturbance defense could not be ruled out, Gemeiner should have obtained a second opinion. He further claims that the court arbitrarily rejected Paetzold's testimony. We disagree.

The petitioner's argument must fail because it is dependent on the credibility of Grove's testimony. Gemeiner himself testified that if Grove had told him during his telephone conversation that an extreme emotional disturbance could not be ruled out, he would have been

obligated to obtain a second opinion. As we stated in part I, the evaluation of Grove's credibility properly was for the trier of fact, the habeas court, to determine.

We likewise find no merit in the petitioner's claim that the habeas "court's assessment of credibility of witnesses was clearly erroneous." It is for the court as the finder of fact to determine the credibility of and the effect to be given to the testimony. *Talton* v. *Warden*, 33 Conn. App. 171, 179, 634 A.2d 912 (1993), aff'd, 231 Conn. 274, 648 A.2d 876 (1994). It was the court's function to assess the testimony of all the witnesses who testified at the habeas proceeding. We decline the petitioner's invitation to disturb the court's findings in that regard. We conclude that the court properly denied the petition for a writ of habeas corpus.

The judgment is affirmed.

In this opinion the other judges concurred.