RYAN THOMPSON *v.* COMMISSIONER
OF CORRECTION
(AC 32044)

Robinson, Bear and Peters, Js.

Argued April 11—officially released September 27, 2011

*Adele V. Patterson,* senior assistant public defender, for the appellant (petitioner).

*Timothy J. Sugrue,* assistant state's attorney, with whom, on the brief, were *Patricia M. Froehlich,* state's attorney, *Angela R. Macchiarulo,* senior assistant state's attorney, and *Erika L. Brookman,* deputy assistant state's attorney, for the appellee (respondent).

*Opinion*

BEAR, J. The petitioner, Ryan Thompson, appeals following the denial of his petition for certification to appeal from the judgment denying his petition for a writ of habeas corpus. The petitioner claims that the habeas court abused its discretion in denying certification to appeal in that it (1) erred in rejecting his claim that his trial counsel had provided ineffective assistance and (2) erred in excluding evidence relevant and admissible to prove the elements of ineffective assistance of counsel. We dismiss the appeal.

The following relevant facts, as stated by our Supreme Court in *State* v. *Thompson,* 266 Conn. 440, 832 A.2d 626 (2003), and adopted by the habeas court, are as follows. "On April 18, 1998, the victim, Robert

McCaffery, and his best friend, John Jones, attended a party at the apartment of Ron Harding in the Moosup section of Plainfield. The [petitioner] and four of his friends, Robert Comeau, Jared Gilkenson, Brandy Stebbins and David Stebbins, also attended, although Harding had not invited them. The [petitioner] and his friends arrived in Brandy Stebbins' car, a purple Chevy Cavalier. The [petitioner] was wearing a white Nike pullover jacket and a baseball cap. Gilkenson had brought the [petitioner]'s nunchakus[1] to the party, which he at first wore in the front of his pants. Later, he showed the nunchakus to people at the party. During the party, an argument started among David Stebbins, the [petitioner] and two brothers, Matt Benoit and Chris Benoit, which continued outside Harding's apartment. Sometime during the course of the argument, while they were still inside, Chris Benoit pushed David Stebbins, who then grabbed the nunchakus from Gilkenson, spun them around, and broke them on the stair railing. Harding, who had come outside because he had heard about the fight, broke it up and told the [petitioner] and David Stebbins to leave. At the same time, and because of the fight, Mandie Green, one of Harding's roommates, told everyone that the party was over.

"In the meantime, before the party had ended, Jones and the victim had decided to leave, but they heard the altercation out front, so they took an alternate route to their car, climbing down the fire escape and cutting through a neighboring yard. While they were walking, Jones suggested that they climb onto the roof of a nearby garage to smoke a cigarette and watch the argument. They climbed on the roof, but by then the argument appeared to have ended. Jones was kneeling in

---

[1] "A set of nunchakus is a weapon that consists of two hardwood sticks joined at their ends by a short length of rawhide, cord, or chain. Oxford English Dictionary (2d Ed. 1989)." *State* v. *Thompson,* supra, 266 Conn. 445 n.6.

front, watching Harding's apartment, and the victim was either kneeling or standing behind and to the right of Jones, out of his field of view. Jones could see persons walking back inside Harding's apartment. He heard a pop coming from his left, but did not think it was significant. When Jones had almost finished his cigarette, he asked the victim if he was ready to leave, but received no response. He turned around to look at the victim and saw that he was lying on his back. He leaned over the victim and saw blood coming from the side of his head. When he tried to give the victim mouth-to-mouth resuscitation, the victim coughed up blood, and Jones began to yell for help.[2]

"At roughly the same time that Jones and the victim were climbing onto the roof, Harding, who was standing at the end of the driveway with his friend Robert Latour, saw the [petitioner], David Stebbins and Gilkenson enter Brandy Stebbins' car. Harding then began walking back up the stairs to his apartment. Latour, who remained outside, saw the [petitioner] and Gilkenson get into Brandy Stebbins' car. David Stebbins then walked over to the car, reached into it, walked over to Latour with a rifle, aimed the rifle directly at Latour's face, and told Latour that he would shoot him. Latour responded, Whatever. David Stebbins then returned to the car, handed the rifle inside the car, and entered the car. Latour then saw the car drive for a short distance and then stop. Latour next saw the [petitioner], wearing a white Nike jacket, exit the car carrying something that looked like a rifle, and run between two houses. Latour then heard a pop, and heard Jones screaming from the nearby garage rooftop. In order to ascertain what had happened, Latour walked on the grass toward

---

[2] "An autopsy conducted the next day, April 20, 1998, determined that the victim had been killed by a bullet to his head. The bullet was examined on May 11, 1998, by a firearms examiner and was identified as a .22 caliber long rifle variety." State v. Thompson, supra, 266 Conn. 446 n.7.

the garage roof where Jones and the victim were located. Jones was yelling that the victim had been shot and that someone should call 911. Latour went back into Harding's apartment and told the people inside to call 911.

"Meanwhile, Harding also had heard the popping sound and came back down the stairs and outside. He saw a person, whom he could not positively identify, but who was wearing a white pullover jacket, running with his hands in front of him. That person ran to Brandy Stebbins' car and entered it, and the car drove off. Harding then saw Jones on a roof, waving his arms and yelling for someone to call 911. Harding climbed up to the roof, where he found Jones kneeling over the victim and screaming help me.

"Officer Brandon Tyrrell of the Plainfield police department arrived at the scene, where Harding told him that the [petitioner], who had returned to the scene and was walking nearby, still wearing a white jacket, might have some information. Tyrrell drove over to the [petitioner] and asked him about the party, and the [petitioner] responded that he knew only what others had told him. When Tyrrell continued to question the [petitioner], the [petitioner] repeatedly stated: Just arrest me. I didn't shoot anybody. Just arrest me. Tyrrell told the [petitioner] that he was not under arrest, and that Tyrrell just wanted to question him. Tyrrell then left the [petitioner] with another officer and returned to the crime scene. The [petitioner] then reappeared at the scene and began to yell that he had not shot anyone and questioned why anyone would believe that he had done so. Tyrrell and the other investigating officers asked the [petitioner] to leave. When the [petitioner] continued to cause a disturbance, Tyrrell arrested him for breach of the peace, brought him to the police station, and told him that he was under arrest for causing a disturbance, not for shooting anyone. The [petitioner],

who appeared to be intoxicated, continued to insist that he did not shoot anyone and also asked Tyrrell if the guy was all right.

"Meanwhile, detectives were sent to locate and interview the other occupants of Brandy Stebbins' car. At approximately 1:50 a.m. on April 19, Detective Martin Graham and Lieutenant William Holmes located David Stebbins at his home, along with Brandy Stebbins, Gilkenson and Stebbins' mother. David Stebbins accompanied Graham and Holmes to their cruiser, where he provided a written statement that he, Brandy Stebbins, Gilkenson and the [petitioner] had left the party without incident. David Stebbins and Gilkenson also agreed to go [to] the police station for administration of a gunshot residue test. When they entered the station, Graham heard the [petitioner], in an adjoining room, screaming, yelling and swearing. After administration of the test, the police drove David Stebbins home.

"While Graham and Holmes were taking David Stebbins' statement, Detectives Richard Bedard and David LeBlanc interviewed the [petitioner] at the police station. Immediately after the [petitioner] had waived his *Miranda* rights,[3] LeBlanc noticed a bite wound on the [petitioner]'s forearm, which the [petitioner] told him he had inflicted on himself while he was in his cell. The [petitioner] was agitated, and expressed concern that he had been arrested for shooting someone. After Bedard and LeBlanc assured him that he was under arrest for breach of the peace, not for shooting someone, the [petitioner] agreed to speak to them. During the interview, the [petitioner] asked them who had been hurt and how. When Bedard said that someone at the party had been shot, the [petitioner] immediately jumped up and started to scream and swear at the

---

[3] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

detectives. After they had succeeded in calming the [petitioner], he asked: What did he get shot with a .22? The detectives were surprised at this question because at that point no one involved in the investigation knew the caliber of the weapon used, and they glanced at each other. The [petitioner] then stated: Or a shotgun. When Bedard responded that the weapon used was not a shotgun, the [petitioner] again began screaming and swearing at the detectives. When the detectives had once again calmed the [petitioner], Bedard asked him who at the party had a gun. The [petitioner] again became belligerent, swearing and insisting that there was no gun at the party. When the detectives told the [petitioner] that they would be questioning everyone who was at the party that night, he replied, Well, my boys won't talk to you.

"During the interview, LeBlanc left the room to answer a page. When he returned, he informed the [petitioner] that he had just been told that the victim was not expected to survive and that the victim's family had decided to donate his organs. At that point, the [petitioner] became enraged, making growling noises, clenching his fists, screaming obscenities and making obscene gestures at LeBlanc. Realizing that they could not control the [petitioner], the detectives decided to end the interview.

"When LeBlanc and Bedard had finished interviewing the [petitioner], Bedard took a statement from Gilkenson, who was still at the station. In his statement, Gilkenson denied any wrongdoing by himself or any member of his group. The [petitioner] also subsequently gave a written statement, indicating that he went to the party, but that he and his friends left the party at around 11 p.m. without incident.

"On April 19, 1998, Joseph Luberto, who knew the [petitioner] from school and had heard about the shooting, called the [petitioner] and asked him whether he

had done it. The [petitioner] denied shooting the victim. Furthermore, although Luberto had not mentioned and did not know the caliber of the weapon, the [petitioner] added that he did not know how to load a .22 caliber rifle.[4]

"Also on April 19, 1998, based on information they had received in the course of their interview of Latour, the police decided to interview Gilkenson and David Stebbins a second time.[5] Detectives Norman Nault and Steven Rief questioned Gilkenson at his home, in the presence of both of his parents. Initially, Gilkenson repeated his initial assertion that he had no knowledge pertaining to the murder of the victim, but, upon being told that the police had information that someone from Brandy Stebbins' car shot the victim, and upon the urging of his parents, Gilkenson gave the police a second statement, in which he told them that when he, David Stebbins, Brandy Stebbins and the [petitioner] were leaving the party, the [petitioner], before they left and before he got into the car, came running toward the car with a rifle in his hand. The [petitioner] got into the backseat and leaned the gun against the side window, covering the gun with his arm. The [petitioner] then said something about he just shot somebody, let's get the hell out of here.

---

[4] "Chad Burski, who was the father of Brandy Stebbins' son, testified, however, that he and the [petitioner] had gone shooting together approximately thirty times prior to April, 1998. Although he admitted that the [petitioner] was a bad shot, he stated that he had seen the [petitioner] load a .22 caliber rifle." *State* v. *Thompson,* supra, 266 Conn. 450 n.11.

[5] "Both Gilkenson's and David Stebbins' second statements were admitted at trial for their substance, pursuant to *State* v. *Whelan,* 200 Conn. 743, 513 A.2d 86, cert. denied, 479 U.S. 994, 107 S. Ct. 597, 93 L. Ed. 2d 598 (1986). A statement is admissible for its substance under *Whelan* if it is: (1) a prior inconsistent statement; (2) signed by the declarant; (3) who has personal knowledge of the facts stated; and (4) the declarant testifies at trial and is subject to cross-examination. The trial court. . . found that all four elements of *Whelan* were met for both statements." *State* v. *Thompson,* supra, 266 Conn. 450 n.12.

"Bedard and LeBlanc located David Stebbins at home, and he agreed to accompany them to the police station for questioning. In David Stebbins' second statement, he said that when the [petitioner] had arrived at his house to go to the party, the [petitioner] had stuffed a .22 caliber rifle down his pant leg. The [petitioner] told David Stebbins, Brandy Stebbins and Gilkenson that he was going to sell it to someone in Moosup. Brandy Stebbins then said, I hope that's not loaded, to which the [petitioner] replied in the negative.[6] When they arrived at the party, the [petitioner] left the rifle in the backseat of the car. When they left the party, David Stebbins, the [petitioner], Gilkenson and Brandy Stebbins were in the car. They pulled away, and the [petitioner] told Brandy Stebbins to stop the car and that he would be right back. The [petitioner] then exited the car holding the rifle, and ran in between two buildings that were near Harding's apartment. Within fifteen seconds, they all heard a popping noise. The [petitioner] then came running back to the car, got into the backseat with the rifle in his hand, threw the rifle into the backseat and said, let's get out of here. I think I hit somebody. When they arrived at David Stebbins' house, the [petitioner] took the rifle and ran toward his house. David Stebbins stated that he and Gilkenson were real scared and hoped that the [petitioner] had not shot anybody.

"On April 20, 1998, the police arrested the [petitioner] for the murder of the victim. At the time of the arrest, detectives seized the white jacket that the [petitioner] had been seen wearing on the night of April 18. The gunshot residue test performed on the jacket revealed one particle of lead and one particle of antinomy, both

---

[6] "David Stebbins later recanted this portion of his second statement in a third statement that he gave to Rief and Nault. In his third statement, David Stebbins explained that he had fabricated this exchange between his sister and the [petitioner] in an attempt to protect his sister." *State* v. *Thompson*, supra, 266 Conn. 451 n.13.

of which are consistent with gunshot residue. The gunshot residue tests performed on swabs taken from Gilkenson and David Stebbins revealed lead on both of their hands." (Internal quotation marks omitted.) *State v. Thompson*, supra, 266 Conn. 444–52.

The petitioner was charged with murder with the use of a firearm in violation of General Statutes § 53a-54a. Id., 443. In the underlying criminal trial the petitioner was represented by attorney Arthur Meisler.

At trial, the state presented the testimony of Henry C. Lee, the commissioner of the department of public safety and director of the Connecticut forensic laboratory, regarding the crime scene reconstruction. Lee performed the reconstruction with his assistant, Robert O'Brien, a supervising criminalist at the laboratory. Regarding the location of the shooter, Lee stated that the "[e]xact location . . . I cannot tell you." Lee offered his opinion as to the most likely position of the shooter, which was the area of grass between the two buildings where Latour had claimed to see the petitioner running with the rifle. During Meisler's cross-examination, Lee acknowledged that his opinion was based on certain assumptions. Lee also indicated that he had assumed that the bullet had travelled in a straight line from the gun barrel to the victim's head without coming into contact with another structure or object. He stated, "I cannot tell you exactly where the shooter stand. I only can say—tell you mostly likely . . . ."

The state also presented the testimony of Virginia Maxwell, a criminalist in the trace and instrumentation sections at the forensic science laboratory, regarding the particles found on the jacket that the petitioner was wearing. During Meisler's cross-examination of Maxwell, she stated that the presence of the three elements of lead, antimony and barium is a positive indication that a particle is gunshot residue. Maxwell conceded

that, without the presence of those three elements, it was impossible to say the particles were gunshot residue. Maxwell also acknowledged that there are a number of environmental sources of lead. O'Brien, who also testified on this subject, echoed Maxwell's statements and stated that particles on the petitioner's jacket were consistent with gunshot residue, but he could not say that they definitely were gunshot residue.

As part of the defense, Meisler sought to discredit the *Whelan* statements of David Stebbins and Gilkenson that inculpated the petitioner. Gilkenson, David Stebbins and Brandy Stebbins all testified, denying any involvement by a member of their group and maintaining that they had left the party prior to the shooting.[7] Gilkenson and David Stebbins maintained that the police had coerced them into giving their second statements, which they testified were false.[8]

More specifically, Gilkenson, who gave his second statement the day following the shooting, spoke with the police at his home in the presence of his parents. At trial, Gilkenson testified that the officers questioning him refused to accept his version of events and repeatedly told him that he was "the only one [of the group] that's not coming clean." The police told Gilkenson that the others in the group had already given statements inculpating the petitioner and that Gilkenson's refusal to do the same made him "look guilty." Gilkenson's father testified that while the officers were at his home they behaved aggressively at times. Gilkenson's father

---

[7] The petitioner also testified that there were no guns in the car and that the group had left the party without incident.

[8] At the habeas trial, Gilkenson and David Stebbins testified that they each subsequently entered pleas of guilty pursuant to *North Carolina* v. *Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970), to crimes relating to perjury and false statement. Brandy Stebbins testified that she was subsequently charged with perjury and hindering prosecution, but the charges were dismissed following her successful completion of accelerated rehabilitation.

also testified that a detective falsely told him, outside the presence of his son, that "at least three" witnesses had seen the petitioner shooting the rifle. The officers then told Gilkenson's parents it was very important that Gilkenson "[come] clean and . . . describe everything that he saw." Gilkenson's father said, from that point on, that he and his wife "pretty much really hammered" Gilkenson to tell the truth. Gilkenson's father said Gilkenson was "crying and pleading" that he had not seen a gun. Gilkenson testified that one of the officers received a call on his mobile telephone, went out of the room, came back and told him and his parents that the petitioner had confessed. Gilkenson's father testified that, upon hearing that the petitioner had confessed, his parents urged him, outside the presence of the officers, "[y]ou've got to come clean and you got to let us know what happened here. I mean, [the petitioner] has said that he did this." Gilkenson then responded with something to the effect of "Okay. Bring them in. I'll tell them what they want to hear." Gilkenson testified that he gave the second statement inculpating the petitioner in response to this pressure from the officers and his parents, and that he "just fill[ed] in little blanks out of their story that they created." Gilkenson and his father also testified that the day after he gave the second statement, he called the police and told them he wanted to recant his second statement, but the police refused to take an additional statement.

David Stebbins testified that in the early morning hours following the party, he was in his front yard talking to a Plainfield police officer when some officers from the major crime squad arrived at his home. He said the officers pulled him by his arm into their car and brought him to the police station. David Stebbins testified that, while at the police station, the officers "started telling me how my friend fucked me and you're

all going down . . . ." He testified that the police offi-cers repeatedly accused him of lying. He stated that he signed the statement inculpating the petitioner because "they scared me in using their tactics and pretty much tricked me into giving them false information. . . . They said we were all going down if we didn't tell them what they wanted to hear." David Stebbins further testified that, after arriving home, he told his uncle that the police had coerced him into giving a false statement. He testified that his uncle then called the police and asked him to come back to the house so he could recant his statement. He testified that the next day the police came to his house and told him that if he wanted to recant his statement he would have to "do it on the stand." He stated that the officers began to be aggressive with him and that his father "had to tell them to chill out and stop putting words into my mouth . . . ." The father testified that while the officers were at the home they occasionally behaved aggressively and insisted on telling David Stebbins what they thought had happened and refused to accept any account that conflicted with their version of events.

Meisler also introduced evidence that cast doubt on Latour's testimony inculpating the petitioner. Paul Benoit, the father of Chris Benoit and Matt Benoit, testified that, shortly after the shooting, he encountered Latour, who told him, "I just saw Stebbins shoot some-one." Meisler also introduced the testimony of Sergeant John Turner of the state police major crime squad, who stated that Latour's mother informed him that Latour had told her that David Stebbins was the shooter.

In his closing argument, Meisler highlighted the con-cessions made by the state's experts regarding the gun-shot residue and the scene reconstruction. He discussed the tactics the police used when interviewing David Stebbins and Gilkenson. He also highlighted the incon-sistencies in Latour's statements, citing Paul Benoit's

testimony that Latour had told him that David Stebbins was the shooter. Nevertheless, the jury found the petitioner guilty of the lesser included offense of reckless manslaughter in the first degree with a firearm in violation of General Statutes §§ 53a-55 (a) (3) and 53a-55a, and the petitioner was sentenced to a term of twenty-five years incarceration. Our Supreme Court affirmed the judgment of conviction on appeal. *State v. Thompson*, supra, 266 Conn. 486.

Apart from his appeal, the petitioner filed a pro se petition for a writ of habeas corpus. On January 29, 2004, a special public defender was appointed to represent the petitioner in that matter. On September 11, 2007, the petitioner filed a second amended petition for a writ of habeas corpus, raising a claim of ineffective assistance of trial counsel.[9] The petitioner alleged, inter alia, that Meisler[10] had failed to adequately investigate and/or present (1) evidence that would have impeached the testimony of Harding and Latour; (2) evidence that suggested that the *Whelan* statements were the product of coercive police interrogation techniques; and (3) evidence that would have cast doubt on the state's crime reconstruction and gunshot residue evidence. The habeas corpus trial took place on seven dates between January 8 and July 16, 2009.

At the habeas trial, the petitioner's father, Scott Thompson, testified that, prior to the criminal trial, he was informed that an individual named Jason Gallow

---

[9] The second amended petition also included an additional count that alleged that the petitioner had been deprived of his state and constitutional right to trial by an impartial jury. This count was based on a postverdict relationship that developed between a trial prosecutor and a juror. The habeas court rejected this claim, stating that "[t]here is no evidence whatsoever indicating that [the juror] was anything but impartial or indifferent, nor that [the trial prosecutor] did anything that would affect her impartiality or indifferent approach by being an external influence." The petitioner does not appeal from the denial of the second count.

[10] Meisler died in March, 2001.

had claimed that Latour had not been at the party during the shooting but was instead with him at a nearby bar called The Hangout. Scott Thompson shared this information with Meisler and Meisler's investigator, Ernest Rubino.[11] At the habeas trial, Gallow testified that he saw Latour at The Hangout, which was approximately a thirty second walk from Harding's apartment. Gallow testified that, over the course of the night, Latour had been going back and forth between the bar and the party. Gallow said that at one point he asked Latour to go to his car and retrieve his pool cue. Latour did not return and, after several minutes, Gallow went outside to smoke a cigarette when he heard a crack that sounded like a gunshot. According to Gallow, following the gunshot, Latour was in the parking lot of The Hangout and yelled out, "did you guys hear that?" Latour then ran to the party to find out what happened. Gallow stated that no one from Meisler's office contacted him about his observations. On cross-examination, Gallow stated that, at the time of the gunshot, Latour was a football field length away from Gallow and that Gallow did not know what Latour was doing before the gunshot or what Latour observed. Gallow also stated that he had been drinking heavily the night of the shooting. The petitioner also presented the testimony of Stephanie Lavimoniere, who stated that she had attended Harding's party on the night of the shooting and did not see Latour until "later on." Lavimoniere acknowledged, however, because many people attended the party, Latour could have been present without her knowledge.

Gilkenson and David Stebbins testified, consistent with their previous trial testimony, regarding the police interviews.[12] Attorney Martin Zeldis testified as an

[11] Both Latour and Rubino have since died.

[12] The officers who conducted the allegedly coercive interviews also testified. Graham, who interviewed Gilkenson, stated that his interviewing approach is not to intimidate witnesses. Graham estimated that, at most, the interview with Gilkenson lasted two and one-half hours. Detective Charles Sarant, who assisted in the interview of Gilkenson, also testified that the

expert witness in criminal defense and stated that a reasonably competent attorney would have sought expert assistance in the area of interrogation training and techniques and psychology. Zeldis, however, acknowledged that Meisler did bring out evidence of coercion, threatening and intimidation of the witnesses.

The petitioner offered the testimony of Fadia Narchet, a legal psychologist, for the purpose of showing that, if retained, an expert in the area of false confessions would have been able to coach Meisler regarding questions he might ask police officers about their training in interrogation techniques and questions he might ask witnesses about the techniques that were used during their interviews. Such expert would also have been available to testify at trial. Following a *Porter* hearing,[13] however, the habeas court concluded that it would "not permit [Narchet] to offer an ultimate opinion concerning the veracity of any statements made to the police." The court stated that it could not "conclude, based upon the evidence presented today, that any . . . opinion as to the acceptability of analysis of false confessions in the context of statements, that there was a general acceptance in the field of science prior to the year 2000. Indeed, the court . . . recognizes that this is an emerging area, and the parties concede and the record is bereft of any evidence to indicate that any expert in the psychological field, in fact, did testify in any court

interview did not involve any bluffing techniques. Sarant stated that the interviewers encouraged Gilkenson to tell the truth and that the interview was cordial even though Gilkenson became upset at times. Bedard, who interviewed David Stebbins, testified that he did not recall using investigative techniques that involved false information. He testified that the goal of police interviewing is to focus on the inconsistencies in statements. Bedard also stated that he did not make the interview long or share information with David Stebbins but instead let him tell what he knew and did not use leading questions. Bedard also testified that he did not threaten David Stebbins, nor was he deprived of sleep or accused of shooting the victim.

[13] See *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998).

as of the vintage of 2000, on the issue of reliability of confessions or statements of witnesses in this context."

The petitioner also introduced the testimony of Peter Diaczuk, the director of forensic science training at John Jay College, who had reviewed the forensic evidence presented at the underlying trial. With respect to the scene reconstruction, Diaczuk emphasized that determining the victim's position was essential to determining the location from which the gunshot originated. Diaczuk took issue with Lee's testimony, alleging that Lee was more specific about the shooter's position than could be determined. Diaczuk stated that Lee instead sought to verify information provided by a detective regarding the shooter's location instead of exploring various locations to either rule out or confirm a location.

With respect to the gunshot residue, Diaczuk stressed that there were many environmental sources of lead and that Meisler failed to bring out its commonality in his cross-examination of the state's experts. Scott Thompson also testified that he provided Meisler with information relating to gunshot residue, including a possible defense expert and alternative explanations of the presence of lead and antimony on the jacket the petitioner had been wearing.[14] Scott Thompson testified that Meisler told him a defense expert would be unnecessary because the state's witnesses were going to

---

[14] The jacket the petitioner was wearing belonged to the petitioner's sister who frequently visited her husband, a sonar technician at the submarine base in New London. Scott Thompson offered this as a possible explanation for the particles on the petitioner's jacket. Scott Thompson also testified that he ran a video store that stocked DVDs, where the petitioner often worked. He stated that he had researched gunshot residue on the Internet and learned that some of the elements in gunshot residue are used in making DVDs. Scott Thompson had discussed the gunshot residue evidence with a metallurgist who worked with him at a Navy research and development laboratory in Newport, Rhode Island. The metallurgist disagreed with the state's conclusions. The metallurgist offered to assist Meisler to procure an expert witness.

admit the weaknesses in the state's gunshot residue evidence and concede that they could not say that the particles found on the jacket were gunshot residue. Zeldis criticized Meisler's decision to rely on cross-examination. Zeldis also stated that Meisler's cross-examination of O'Brien could have more extensively explored the many potential sources of lead on the white jacket, and he criticized Meisler's questioning as "unfocused." Zeldis further testified on the forensic evidence of the gunshot residue.

In a comprehensive memorandum of decision filed January 20, 2010, the habeas court denied the petition. The court rejected the petitioner's claim that Meisler was deficient in failing to investigate and present evidence that would have impeached the testimony of Latour. The court concluded that the testimony that Gallow and Lavimoniere gave at the habeas trial would have been of little value at the criminal trial and, therefore, reasonably competent counsel would not have been expected to present such evidence. With respect to the taking of the *Whelan* statements, the habeas court found Bedard's testimony regarding the interview of David Stebbins "highly credible." The court also credited Graham's testimony that he was "friendly, cordial and polite" during the interview with Gilkenson and stated that there was "no credible evidence to persuade this court to conclude the circumstances of the taking of the second statement, albeit inculpatory and inconsistent with Gilkenson's in-court and out-of-court statements, either were ripe for fabrication or, at the very least, suggest Gilkenson was dispossessed in his ability to distinguish fact from fiction." The court also rejected the petitioner's claim that Meisler performed deficiently in failing to investigate and present evidence from expert witnesses regarding gunshot residue, crime scene reconstruction and police interrogation techniques. The court found that "Meisler and his investigator, Mr. Rubino, investigated the facts and

circumstances surrounding the events at issue. They also investigated the reconstruction and potential forensic evidence. Meisler then made the decision to rely on cross-examination instead of calling his own expert witness. From its review of his cross-examination, the court can only describe Meisler's cross-examination as exemplifying the skills of a well-seasoned and experienced trial attorney. Meisler's skilled, artful and focused cross-examination highlighted weaknesses, contradictions and flaws in [the] witness' testimony."

The court concluded that "[b]ased on the credible evidence presented at the habeas corpus proceeding, when viewed together with the criminal trial transcripts, the court is hard-pressed to find fault with Meisler's approach." Consequently, the court determined that the petitioner had failed to prove that Meisler's performance had been deficient pursuant to *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).[15]

The petitioner filed a petition for certification to appeal on February 1, 2010. On February 9, 2010, the habeas court denied the petition for certification but granted the waiver of fees and appointed counsel. From that judgment, the petitioner appeals. Additional facts will be set forth as necessary.

On appeal, the petitioner claims that the habeas court abused its discretion in denying certification to appeal. "Faced with the habeas court's denial of certification to appeal, a petitioner's first burden is to demonstrate that the habeas court's ruling constituted an abuse of discretion." *Simms* v. *Warden*, 230 Conn. 608, 612, 646 A.2d 126 (1994). To prove an abuse of discretion, the

---

[15] The habeas court did not rule on whether the petitioner was prejudiced by Meisler's alleged omissions. See *Strickland* v. *Washington*, supra, 466 U.S. 687.

petitioner must demonstrate "that the issues are debatable among jurists of reason; that a court could resolve the issues [in a different manner]; or that the questions are adequate to deserve encouragement to proceed further." (Internal quotation marks omitted.) Id., 616, quoting *Lozada* v. *Deeds*, 498 U.S. 430, 432, 111 S. Ct. 860, 112 L. Ed. 2d 956 (1991). "If the petitioner succeeds in surmounting that hurdle, the petitioner must then demonstrate that the judgment of the habeas court should be reversed on its merits." *Simms* v. *Warden*, supra, 612.

I

The petitioner first contends that the habeas court erred when it denied his petition for a writ of habeas corpus because the record establishes that Meisler's performance was both deficient and prejudicial. The petitioner claims that Meisler's performance was ineffective in that he failed to conduct a thorough investigation of (1) the availability of evidence to impeach Latour, (2) the forensic evidence and (3) the taking of the *Whelan* statements. We disagree.

"We examine the petitioner's underlying claim[s] of ineffective assistance of counsel in order to determine whether the habeas court abused its discretion in denying the petition for certification to appeal." (Internal quotation marks omitted.) *J.R.* v. *Commissioner of Correction*, 105 Conn. App. 827, 831, 941 A.2d 348, cert. denied, 286 Conn. 915, 945 A.2d 976 (2008). A criminal [petitioner] is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, supra, 466 U.S. 686.

"A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong, a claimant must demonstrate that counsel made errors so

serious that counsel was not functioning as the counsel guaranteed . . . by the [s]ixth [a]mendment. . . . Put another way, the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Citations omitted; internal quotation marks omitted.) *Sastrom* v. *Mullaney*, 286 Conn. 655, 662, 945 A.2d 442 (2008). With respect to the prejudice component, "[i]t is not enough for the [petitioner] to show that the errors had some conceivable effect on the outcome of the proceedings." (Internal quotation marks omitted.) *Toccaline* v. *Commissioner of Correction*, 80 Conn. App. 792, 799, 837 A.2d 849, cert. denied, 268 Conn. 907, 845 A.2d 413, cert. denied sub nom. *Toccaline* v. *Lantz*, 543 U.S. 854, 125 S. Ct. 301, 160 L. Ed. 2d 90 (2004). "Because both prongs . . . must be established for a habeas petitioner to prevail, a court may dismiss a petitioner's claim if he fails to meet either prong." *King* v. *Commissioner of Correction*, 73 Conn. App. 600, 602–603, 808 A.2d 1166 (2002), cert. denied, 262 Conn. 931, 815 A.2d 133 (2003).

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's

perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . .

"The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense. Counsel's performance and even willingness to serve could be adversely affected. Intensive scrutiny of counsel and rigid requirements for acceptable assistance could dampen the ardor and impair the independence of defense counsel, discourage the acceptance of assigned cases, and undermine the trust between attorney and client.

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to

make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citations omitted; internal quotation marks omitted.) *Strickland* v. *Washington,* supra, 466 U.S. 689–90.

As our Supreme Court has observed, "[t]he standard of appellate review of habeas corpus proceedings is well settled. The underlying historical facts found by the habeas court may not be disturbed unless the findings were clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. So-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense. . . . Whether the representation a defendant received at trial was constitutionally inadequate is a mixed question of law and fact. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction,* 285 Conn. 585, 597–98, 940 A.2d 789 (2008).

The petitioner argues that "[t]he mere fact that a lawyer makes choices in the course of a criminal representation does not mean that every one of them necessarily qualifies as a strategic choice worthy of the great deference such choices are afforded under *Strickland* v. *Washington* [supra, 466 U.S. 689]."[16] We agree that

---

[16] In support of this proposition, the petitioner cites *Pavel* v. *Hollins,* 261 F.3d 210 (2d Cir. 2001). In *Pavel,* the petitioner's attorney did not prepare a defense, on the theory that the charges would be dismissed at the close of the prosecution's case. However, the court in *Pavel* stated that it was "apparent . . . that [counsel's] decision as to which witnesses to call was animated primarily by a desire to save himself labor—to avoid preparing a defense that might ultimately prove unnecessary." Id., 218. The petitioner has not introduced any evidence which suggests that Meisler's alleged deficiencies in the present case were motivated by a desire to avoid work.

"[c]onstitutionally adequate assistance of counsel includes competent pretrial investigation." (Internal quotation marks omitted.) *Ostolaza* v. *Warden,* 26 Conn. App. 758, 765, 603 A.2d 768, cert. denied, 222 Conn. 906, 608 A.2d 692 (1992). However, "counsel need not track down each and every . . . evidentiary possibility before choosing a defense and developing it." (Internal quotation marks omitted.) Id. "In a habeas corpus proceeding, the petitioner's burden of proving that a fundamental unfairness had been done is not met by speculation . . . but by demonstrable realities." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction,* supra, 285 Conn. 599.

The petitioner first claims that Meisler did not conduct a sufficiently thorough investigation of evidence that could have been used to cross-examine Latour. Specifically, the petitioner argues that Meisler was aware that Gallow was available to testify that Latour was with him at The Hangout during the shooting and, despite having this information, Meisler chose not to interview Gallow. Additionally, the petitioner argues that Meisler should have called Lavimoniere to testify. We disagree.

Meisler's decisions not to interview Gallow and not to call Lavimoniere[17] did not render his investigation of the case inadequate. Meisler elicited testimony that, on the night of the shooting, Latour had told others that David Stebbins was the shooter. Meisler then used this information to cross-examine Latour. For strategic reasons, Meisler may have preferred that, were the jury not to believe Latour's testimony inculpating the petitioner, it would conclude that Latour saw David Stebbins with the rifle rather than conclude that Latour was

---

[17] The record reveals that Meisler did speak to and obtain a written statement from Lavimoniere.

not at the scene.[18] If Meisler had introduced testimony that Latour may not have been in a position to see the shooter, this would cast doubt on the veracity of the testimony of Paul Benoit and Turner regarding Latour's statements that David Stebbins was the shooter. Although the petitioner argues that Meisler's ineffectiveness stemmed from his failure to investigate Gallow's claims and that Meisler's decisions cannot be considered a sound trial strategy unless they were predicated on a thorough investigation, the record reveals that Meisler was aware of the content of Gallow's potential testimony. Meisler cannot be faulted for his failure to interview someone whose testimony would be unhelpful. See *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 79, 967 A.2d 41 (2009) (decision not to call witness consistent with theory of defense). For the same reasons, Meisler may have concluded that Lavimoniere's testimony would be similarly unproductive.[19] Accordingly, we conclude that Meisler's performance was not constitutionally deficient because he

---

[18] Meisler did not explicitly argue that David Stebbins was the shooter, stating in closing that "I don't know if David Stebbins shot [the petitioner], and I don't have to prove that and that's not my purpose. But I do know that that raises the issue of how you should evaluate Bobby Latour's testimony and for what purposes you may use it." The potential defense that David Stebbins was the shooter was complicated by the statements and testimony of the petitioner himself, who maintained that neither he nor any member any of his group had a firearm that night and that they had left the scene prior to the shooting. Meisler, however, presented evidence to make such a defense plausible. As discussed previously, the hands of David Stebbins and Gilkenson both contained traces of lead and Latour testified that, prior to the shooting, David Stebbins pointed a .22 caliber rifle at him and threatened to shoot him. Additionally, Comeau testified that he left a .22 caliber rifle at the Stebbins' house and never saw the weapon again. Harding testified that, one week before the shooting, he was at the Stebbins' house when David Stebbins became angry and brandished a .22 caliber rifle. Erin Whalen, another attendee at the party, testified that, on the night of the shooting, David Stebbins told her that if anyone messed with him, he had three guns in Brandy Stebbins' car. There also was no evidence presented suggesting that anyone else on the scene possessed a firearm.

[19] We also note that, at the habeas trial, Lavimoniere acknowledged that Latour could have been present at the party without her knowledge.

failed to interview Gallow and failed to call Gallow and Lavimoniere as witnesses.[20]

The petitioner also alleges that Meisler was ineffective in his failure to investigate and failure to present expert testimony regarding the crime scene reconstruction and the evidence of gunshot residue. We are not persuaded.

At the outset, we note that "there is no *per se* rule that requires trial attorneys to seek out any expert." (Emphasis in original; internal quotation marks omitted.) *Gersten* v. *Senkowski*, 426 F.3d 588, 609 (2d Cir. 2005), cert. denied sub nom. *Artus* v. *Gersten*, 547 U.S. 1191, 126 S. Ct. 2882, 165 L. Ed. 2d 894 (2006). Further, the record reflects that, after meeting with the state's experts, Meisler made the determination that an expert would not be necessary and that he could elicit the necessary testimony through cross-examination and he succeeded in doing so. Regarding the gunshot residue, the state's experts testified, on cross-examination, that (1) they were unable to say for certain whether gunshot residue was present on the jacket the petitioner was wearing, (2) that there were alternative sources of the elements found on the jacket in the environment, and (3) that none of the particles found on the jacket were unique to gunshot residue or positive indication of gunshot residue.

With respect to the crime scene reconstruction, Lee conceded that his conclusion about the area from which the gunshot was fired was based on a number of unknowns as assumptions. As there was no evidence suggesting that any other individual at the party was in possession of a firearm that night and only David

---

[20] We also agree with the habeas court that the petitioner was not prejudiced by Meisler's failure to call Gallow, as Gallow had admitted that he had been drinking heavily the day of the shooting and there was "little, if any, value in Gallow's testimony."

Stebbins and the petitioner were identified as carrying a rifle, Meisler reasonably may have concluded that efforts to demonstrate that a gunshot came from a different location would be an unproductive distraction, and that the focus of the defense should be on the identity of the shooter rather than the location of the gunshot.

While the petitioner argues that Meisler was deficient in his investigation of the forensic issues, he fails to cite any material evidence that Meisler failed to uncover or present to the jury that would have assisted in the defense. The testimony offered by Diaczuk at the habeas trial regarding the issues of gunshot residue and crime scene reconstruction would not have contributed to the defense beyond the testimony Meisler elicited from cross-examination of the state's experts at trial. In its memorandum of decision, the habeas court noted that it could not "discern any real or tangible benefit to be gained from presenting the expert testimony as alleged by the petitioner." We agree with the habeas court that Meisler's decisions regarding the investigation and presentation of expert testimony regarding the forensic issues in the case did not render his performance deficient. We cannot say that Meisler's investigation was deficient when the petitioner has not provided any material evidence that such investigation failed to uncover.

Finally, the petitioner claims that Meisler was deficient in that he did not conduct a thorough investigation of the taking of the *Whelan* statements. We disagree.

The record reveals that Meisler interviewed Gilkenson and David Stebbins and discussed the allegedly coercive circumstances surrounding their statements. Furthermore, Meisler effectively attacked the reliability of the *Whelan* statements by eliciting firsthand accounts

of the alleged police tactics from David Stebbins, Gilkenson, David and Brandy Stebbins' father and Gilkenson's parents. We agree with the habeas court that "it was the province of the jury to decide whether to believe Brandy Stebbins, [Gilkenson] and David Stebbins, as well as which statements to accredit. Similar to the court itself in a habeas trial, the jurors in the underlying trial were in the best position to judge credibility." We also agree with the habeas court that Meisler's decision not to call or consult with an expert on police interrogation training and techniques did not render his performance ineffective. "Expert testimony was neither necessary nor desirable where the record reflects purposeful questioning through the art of cross-examination by Meisler . . . ."

The record contains no evidence that Meisler failed to investigate adequately the circumstances of the taking of the *Whelan* statements and no evidence that demonstrates that Meisler's representation of the petitioner was constitutionally deficient. The petitioner has failed to rebut the strong presumption that Meisler's investigatory efforts were professionally reasonable. We, therefore, conclude that Meisler's investigation of the *Whelan* statements was not deficient.

*Strickland* imposes on the petitioner the burden to establish that counsel's performance was constitutionally deficient and that such deficient performance prejudiced the defense. "Unless [a petitioner] makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." (Internal quotation marks omitted.) *Parrott* v. *Commissioner of Correction*, 107 Conn. App. 234, 236, 944 A.2d 437, cert. denied, 288 Conn. 912, 954 A.2d 184 (2008). Having reviewed the record, and for the reasons set forth previously, we conclude that the petitioner has not established that Meisler's performance was deficient and, therefore, he

cannot prevail on his claim of ineffective assistance of counsel.

## II

The petitioner also argues that the court improperly denied him "the hearing to which he was entitled" by excluding evidence to prove the elements of ineffective assistance of counsel. The petitioner argues that the habeas court improperly (1) excluded testimony by the petitioner's appellate attorney, Moira Buckley, regarding "what she would have done differently absent trial counsel's omissions" and (2) declined in its memorandum of decision to assign an " 'evidentiary value' " to the testimony of the petitioner and his father regarding Meisler's allegedly eccentric behavior. We disagree.

The applicable standard of review for evidentiary challenges is well established. "Unless an evidentiary ruling involves a clear misconception of the law, the [t]rial court has broad discretion in ruling on the admissibility . . . of evidence. . . . The trial court's ruling on evidentiary matters will be overturned only upon a showing of a clear abuse of the court's discretion. . . . We will make every reasonable presumption in favor of upholding the trial court's ruling . . . ." (Internal quotation marks omitted.) *Crawford* v. *Commissioner of Correction*, supra, 285 Conn. 602–603.

At the habeas trial, Buckley testified as a fact witness for the petitioner regarding the post-conviction proceedings. The petitioner attempted to elicit an opinion from Buckley regarding the effects that Meisler's alleged errors may have had on the appeal. The respondent, the commissioner of correction, objected to such testimony. The habeas court sustained the objections, concluding that Buckley was being asked for an expert opinion, that she had not been disclosed as an expert witness, and that the respondent was surprised and prejudiced by the proffered testimony.

"A petition for a writ of habeas corpus must set forth specific grounds for the issuance of the writ. Practice Book § 23-22 (1) specifically provides that the petition shall state the specific facts upon which each specific claim of illegal confinement is based and the relief requested . . . ." (Internal quotation marks omitted.) *Corona* v. *Commissioner of Correction*, 123 Conn. App. 347, 354, 1 A.3d 1226, cert. denied, 299 Conn. 901, 10 A.3d 519 (2010). The petitioner argues that the operative petition might be construed as challenging the result of both the trial and the direct appeal. We conclude, however, that the habeas court's construction of the petition as not challenging the result of the direct appeal is fully supported by the record.[21] Therefore, the court did not abuse its discretion in excluding the testimony.

Last, the petitioner argues that the habeas court erred in declining to assign " 'evidentiary value' " to testimony from the petitioner and Scott Thompson regarding Meisler's mental and emotional health. In the petition, the petitioner alleged that Meisler "suffered mental and/ or emotional difficulties, including stress and/or depression" that "impaired his ability to function effectively as counsel." In support of the claim that Meisler suffered "mental and/or emotional difficulties," Scott Thompson and the petitioner testified that Meisler was quirky and a bit eccentric, that he once wore mismatched shoes and mismatched socks to court, occasionally forgot or mixed up names and occasionally appeared confused. The court rejected the claim that psychological problems rendered Meisler's performance deficient, stating that there was no "credible evidence that affirmatively show[ed] that Meisler was suffering from mental and/

[21] Paragraph 7 of count one of the second amended petition alleged that Meisler's representation of the petitioner "in connection with the trial proceedings" was deficient. Paragraph 7 (a) and (d) of the petition identify these proceedings as both "pretrial" and "during trial" and "at trial." There is no reference to the direct appeal.

or emotional difficulties, or stress or depression, that affected his performance prior to and during the criminal trial." We agree with the respondent that by " 'evidentiary value'," the court meant "probative value," and that the court considered the testimony but declined to assign it weight. We conclude that the habeas court was within its discretion not to assign any probative value to the testimony of the petitioner and Scott Thompson as to the claimed existence of a mental impairment.

Accordingly, the petitioner has failed to establish that the issues he has raised are debatable among jurists of reason, that a court could have resolved them in a different manner or that the questions he has raised are adequate to deserve encouragement to proceed further. We therefore conclude that the habeas court did not abuse its discretion in denying the petition for certification to appeal.

The appeal is dismissed.

In this opinion the other judges concurred.