## STEPHEN S.[1] v. COMMISSIONER OF CORRECTION
### (AC 32727)

Gruendel, Robinson and Sullivan, Js.

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to use the petitioner's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Argued January 19—officially released April 17, 2012

*Mary H. Trainer*, special public defender, for the appellant (petitioner).

*Margaret Gaffney Radionovas*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *David Clifton*, assistant state's attorney, for the appellee (respondent).

*Opinion*

ROBINSON, J. The petitioner, Stephen S., appeals from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. On appeal the petitioner asserts that the habeas court erred in denying his claim of ineffective assistance of trial counsel because his trial counsel (1) did not sufficiently consult with expert witnesses regarding the physical evidence of sexual abuse in the petitioner's case and (2) failed to consult with experts in the field of child sexual abuse to counter the prosecution's witnesses. We disagree with the petitioner's contentions, and, accordingly, affirm the judgment of the habeas court.

The following facts and procedural history are relevant to the resolution of the petitioner's claim. The victim, the petitioner's daughter, accused the petitioner of sexually assaulting her on a regular basis from the time that the victim was four years old until she was

nine years old. The victim was evaluated by the Yale Child Sexual Abuse Clinic, where she detailed the alleged sexual abuse and was physically examined by Janet Murphy, a nurse practitioner. The victim testified at the petitioner's criminal trial in graphic detail about the physical and sexual abuse that she suffered.

At the petitioner's criminal trial, the prosecution provided the testimony of Murphy. Murphy testified that the victim had a "normal exam." She testified that "there is a whole range of what normal can mean. But basically what I'm looking for is any kind of sign or mark left from the touching that may have occurred. And basically by saying normal, I saw no sign of sexually transmitted disease, and I did not see any sign or mark which pretty most of the kids we see for concerns of sexual abuse. Despite what—you know, many kids report a variety of different things, those children will have normal exams." When asked if it was unusual to have a normal exam for a child who has claimed that they were sexually abused, Murphy responded that "[n]o, it's not unusual." When asked to explain, Murphy testified: "First reason would be many times when the medical evaluation is performed, there has been a fair amount of time that has passed from when the incident occurred to when we are seeing the child. And so in that amount of time tissue can heal very quickly. And to—in a way where there is no evidence or mark left." When asked directly if something in the genital area could heal without leaving a scar, Murphy responded in the affirmative. Murphy also testified about possible indicators of sexual abuse, noting that one physical indicator is that a child suffers from encopresis, a condition where a child retains their bowel movements.

Celmira Gonzalez, an investigator with the department of children and families, testified at the petitioner's criminal trial that when speaking to the victim, the victim's demeanor was that of someone who was "too

mature for her age." When asked if the victim exhibited any indicators of abuse, Gonzalez answered in the affirmative and noted that the victim "presented herself like an adult, like a child that her infancy and her childhood was vanished already."

Elizabeth Stenger, a social worker at the Clifford W. Beers Guidance Clinic, testified at the petitioner's criminal trial as to "red flags" of potential abuse. The prosecution proceeded by presenting the following hypothetical to Stenger: "I'm going to ask you to make some assumptions. A child has alleged that they have been sexually abused and suffers from or claims to suffer from auditory hallucinations of her perpetrator and visual hallucinations of the perpetrator and seems to appear distrustful of other individuals in particular men, has an inability to sleep by themselves, has issues of hygiene in terms of changing underwear or taking showers or baths, trouble sleeping, either falling asleep or staying asleep, trouble in school, oppositional behavior to a—either parental figure or a caretaker, would that behavior be consistent with a child who has been sexually abused?" Stenger responded in the affirmative.[2]

The petitioner was convicted after a jury trial of three counts of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (2), two counts of risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (1), one count of risk of injury to a child in violation of General Statutes (Rev. to 1997) § 53-21 (2), and one count of unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a). The petitioner was sentenced to a total term of sixty years of incarceration, consisting of three consecutive twenty year terms on the sexual assault counts and

---

[2] The defense presented the testimony of the petitioner, the petitioner's girlfriend, Sharon Levy, and the victim's neighbor Peter Cofrancesco.

concurrent terms on the remaining counts. The petitioner appealed to this court, and we affirmed the judgment of the trial court.

The petitioner filed a petition for a writ of habeas corpus alleging ineffective assistance of both trial and appellate counsel.[3] In the petitioner's amended petition his principal claims pertaining to the ineffective assistance of trial counsel were that his trial counsel did not conduct sufficient consultation regarding the medical proof available to the prosecution, did not meaningfully challenge the testimony of medical personnel who testified for the prosecution, did not present medical testimony to support the petitioner's declaration of innocence, did not introduce as evidence medical reports concerning the victim's behavior and mental health, failed to object to constancy of accusation witnesses and failed to object to the prosecution's cross-examination of the petitioner.

At the habeas proceeding, the petitioner's trial counsel, Martin McQuillan, testified that prior to trial he had consulted with Frederick J. Rau, the director of the division of gynecology at the Connecticut Children's Medical Center. McQuillan testified that he sent Rau results of the victim's medical examination, which had reported a normal finding. Rau informed McQuillan that a normal finding from a physical examination could be consistent with child sexual abuse and that he could not testify to a reasonable degree of medical probability that a normal finding would be inconsistent with penile-vaginal penetration, penile-anal penetration or tongue

---

[3] The habeas court concluded that both trial and appellate counsel did not render ineffective assistance. Although the petitioner included claims against his appellate counsel in his petition for certification to appeal, those claims were not included in the present appeal. The petitioner also does not appeal the habeas court's decision concerning trial counsel's alleged failure to object to the constancy of accusation witnesses and to the prosecution's cross-examination of the petitioner.

to vaginal penetration. McQuillan further stated that subsequent to Murphy's testimony for the prosecution that a normal finding was not unusual in child sexual abuse cases, he specifically discussed Murphy's testimony with Rau, and Rau indicated that if he testified, his testimony would be the same as Murphy's testimony.

McQuillan also testified that he had consulted with Peter Zeman, a psychiatrist at the Institute of Living, to evaluate the petitioner and to review the victim's records. Zeman apprised him that everything in the victim's records was consistent with someone who had been sexually abused as a child. McQuillan testified that a substantial reason why he chose not to introduce the victim's records at the criminal trial was because he did not want to open the door and to give the prosecution the opportunity to elicit testimony that the victim's behavior was in fact consistent with child sexual abuse.[4]

At the habeas proceeding, the petitioner provided expert testimony from Mark Taff, a forensic pathologist. Taff testified that if a child's genitalia were penetrated by adult male genitalia, it could result in a laceration or tear, the healing process of which, depending on its

---

[4] The relevant testimony from the habeas trial is as follows:

"[The Respondent's Counsel]: And Dr. Zeman told you that everything in those records were basically consistent with someone who had been sexually abused as a child, didn't he?

"[McQuillan]: That's what my father [and law partner Paul McQuillan, in the firm of Januszewski, McQuillan and Denigris] informed me, that the discussion that he had with Dr. Zeman indicated that, you know, by going down this avenue with these records, you know, he could not testify that—that he would testify that it is consistent; that he knew he would be asked about that; and that these are consistent with someone who has—you know, a child who's been abused.

"[The Respondent's Counsel]: So, in other words, you didn't put in anything about those records because had you done it, you would have opened the door to the state on direct to elicit the—that that behavior was, in fact, consistent with child sexual abuse.

"[McQuillan]: Correct. Amongst—I would say, amongst other reasons, but that was a substantial reason."

size, would result in the formation of a scar. Taff testified that if the injury is superficial, an individual can have a bruise of various sizes, which will usually heal itself within one or two weeks. Taff further testified that "based on the frequency that was reported and my understanding of the reports that the lack of evidence would be inconsistent with [numerous occurrences of anal penetration], that I would as a physician expect to find some type of anal injury to a child who has been penetrated multiple times by a normally formed, erect adult male. . . . If the child was examined in the acute phase, soon after the alleged [anal] penetration, there should be some bruising, some hemorrhaging, possible laceration. There could be some congestion—vascular congestion in that area, and there would be clinical signs and symptoms to go with the anatomical findings if the child had been penetrated; and I would expect the child to express some type of pain soon after such an assault." On cross-examination Taff testified that it was not medically impossible for a laceration in the vaginal area not to leave a scar. Further, he testified that it is possible for no injuries to be inflicted during normal consensual intercourse.

The petitioner also provided the expert testimony of David Mantell, a licensed psychologist in Connecticut. Mantell testified that he examined the medical report of the victim and that in his professional opinion, he believed that there should have been further investigation into the dysfunctional relationship that the victim had with her mother, and the potential affect that the victim's history of encopresis may have had on her complaint against the petitioner.

The court denied the petitioner's petition for a writ of habeas corpus. In its memorandum of decision, the court addressed the petitioner's various contentions that McQuillan was ineffective. The court noted that McQuillan consulted with Rau, a pediatric obstetrician,

who confirmed that the testimony of Murphy was correct in that a normal finding could be consistent with child sexual abuse. The court also noted that Zeman had reviewed the victim's records and had indicated that, if asked to testify, he would have to testify that the victim's records were consistent with those of an individual who had been sexually abused. The court concluded that the petitioner had not demonstrated that McQuillan rendered deficient performance, and that even if the court were to conclude that McQuillan had rendered deficient performance, the petitioner had not demonstrated prejudice.

The petitioner filed a petition for certification to appeal on August 30, 2010. The petition was granted by the habeas court on September 2, 2010. Additional facts will be set forth as necessary.

We first set forth the relevant standard of review for a challenge to the habeas court's denial of a petition for a writ of habeas corpus when certification to appeal is granted. "The conclusions reached by the trial court in its decision to dismiss [a] habeas petition are matters of law, subject to plenary review. . . . [When] the legal conclusions of the court are challenged, [the reviewing court] must determine whether they are legally and logically correct . . . and whether they find support in the facts that appear in the record. . . . To the extent that factual findings are challenged, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous. . . . [O]ur review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of counsel is plenary. . . . The habeas judge, as the trier of facts, is the sole arbiter of the credibility of witnesses and the weight to be given to their testimony." (Citation omitted; internal quotation marks omitted.) *Boyd* v. *Commissioner of Correction,*

130 Conn. App. 291, 294, 21 A.3d 969, cert. denied, 302 Conn. 926, 28 A.3d 337 (2011).

We next set forth the relevant standard of review for claims of ineffective assistance of counsel. "A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied. . . . Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unworkable. . . . Only if the petitioner succeeds in [this] herculean task will he receive a new trial." (Citation omitted; internal quotation marks omitted.) Id., 294–95.

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;

that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way. . . .

"Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. In making that determination, the court should keep in mind that counsel's function, as elaborated in prevailing professional norms, is to make the adversarial testing process work in the particular case. At the same time, the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (Citations omitted; internal quotation marks omitted.) *Strickland* v. *Washington*, 466 U.S. 668, 689–90, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).

The petitioner asserts two claims in this appeal. The petitioner contends that McQuillan rendered ineffective assistance of counsel because he did not sufficiently consult with (1) expert witnesses regarding the physical evidence of sexual abuse in the petitioner's case and (2) an expert witness on child sexual abuse. Both of the petitioner's claims on appeal concern the failure of McQuillan to provide expert testimony at his criminal

trial, and, accordingly, we will address these claims together.

We begin by noting that there is no per se rule that requires a trial attorney to seek out an expert witness. *Thompson* v. *Commissioner of Correction*, 131 Conn. App. 671, 696, 27 A.3d 86, cert. denied, 303 Conn. 902, 31 A.3d 1177 (2011). In *Peruccio* v. *Commissioner of Correction*, 107 Conn. App. 66, 943 A.2d 1148, cert. denied, 287 Conn. 920, 951 A.2d 569 (2008), however, this court noted that in some cases, "the failure to use any expert can result in a determination that a criminal defendant was denied the effective assistance of counsel." Id., 76. To support this proposition, this court, in dicta, cited to other Connecticut cases and to the conclusion in *Lindstadt* v. *Keane*, 239 F.3d 191 (2d Cir. 2001), that "failure to consult [an] expert on sexual abuse of children constituted inadequate assistance." *Peruccio* v. *Commissioner of Correction*, supra, 76.

There are no Connecticut appellate cases that directly address the issue of the necessity of expert witnesses in child sexual abuse cases. This court in *Michael T.* v. *Commissioner of Correction*, 122 Conn. App. 416, 999 A.2d 818, cert. granted, 298 Conn. 911, 4 A.3d 832 (2010),[5] however, affirmed a habeas court decision that determined that the petitioner's trial counsel rendered ineffective assistance when he failed to provide expert testimony in a case involving child sexual abuse. In *Michael T.*, the petitioner was convicted of sexually abusing a young girl who had become infected with trichomonas. Id., 420. At the petitioner's criminal trial,

---

[5] We note that the Supreme Court has granted certification to appeal in *Michael T.* on the following issue: "Whether the Appellate Court properly held that trial counsel rendered deficient performance by failing to present expert testimony?" *Michael T.* v. *Commissioner of Correction*, 298 Conn. 911, 4 A.3d 832 (2010).

the prosecution provided four expert witnesses on trichomonas, each of whom testified that it was a sexually transmitted disease. Id., 419. The petitioner's trial counsel cross-examined the prosecution's witnesses but did not provide expert testimony. Id., 420. At the petitioner's habeas trial, the petitioner presented the testimony of an expert witness who testified that a child could contract trichomonas if she lived with someone infected with it, who was not careful about hygiene. Id., 421. The habeas court concluded that under the facts of the case, the petitioner's trial counsel rendered ineffective assistance when he did not utilize an expert witness in the petitioner's criminal trial. Id., 422.

This court in *Michael T.* summarized the habeas court's rationale for its decision as follows: "The [habeas] court relied on this court's dictum, in *Peruccio* v. *Commissioner of Correction*, [supra, 107 Conn. App. 76], that, under certain circumstances, such as those involving the sexual abuse of children, the failure to use any expert can result in a determination that a criminal defendant was denied the effective assistance of counsel. The habeas court also cited with approval the detailed analysis contained in *Gersten* v. *Senkowski*, [426 F.3d 588, 607 (2d Cir. 2005), cert. denied sub nom. *Artus* v. *Gersten*, 547 U.S. 1191, 126 S. Ct. 2882, 165 L. Ed. 2d 894 (2006)] and the cases cited therein, in which that court held that '[i]n sexual abuse cases, because of the centrality of medical testimony, the failure to consult with or call a medical expert is often indicative of ineffective assistance of counsel. . . . This is particularly so where the prosecution's case, beyond the purported medical evidence of abuse, rests on the credibility of the alleged victim, as opposed to direct physical evidence such as DNA, or third party eyewitness testimony.' " *Michael T.* v. *Commissioner of Correction*, supra, 122 Conn. App. 423–24. This court then noted that the respondent had not proffered a reasoned

basis for rejecting the habeas court's analysis on the issue of obtaining an expert witness, and concluded that the habeas court had not erred on that issue. Id., 424.

As there is no clear Connecticut authority regarding the potential need for expert witnesses in cases involving child sexual abuse and as *Peruccio* and *Michael T.* have relied in part on cases from the United States Court of Appeals for the Second Circuit, we also look to cases from that circuit for guidance on the issue of using expert witnesses in these unique cases. In *Pavel* v. *Hollins*, 261 F.3d 210 (2d Cir. 2001), the petitioner was convicted of sexually abusing his two sons. Id., 211, 212. Both boys testified at the petitioner's trial that the petitioner had anally sodomized them. Id., 214. The prosecution produced a medical expert who testified that after reviewing the physical examinations of the two boys that the "discoloration [of the skin and redness in the anal area] was consistent with [the child's] account of sexual abuse, and that [the other child] might have been anally sodomized as he described without any physical indication of the sodomy remaining after the fact." (Internal quotation marks omitted.) Id., 215. The petitioner's trial counsel did not call a medical expert to testify as to the significance of the physical evidence produced by the prosecution's expert witness. Id., 223.

The United States Court of Appeals for the Second Circuit noted that trial counsel's decision not to call a medical expert might "have been beyond reproach if it had been based on appropriate strategic considerations, or if it had been made by [trial counsel] following a sufficient investigation." Id. The court, however, found that trial counsel's failure to provide expert testimony was not strategic, and that his decision not to call a medical expert "was deficient because it was not based on pre-trial consultation with such an expert." Id. The court stated: "Indeed, many sex abuse cases are close

. . . on the evidence . . . and when a case hinges all-but-entirely on whom to believe, an expert's interpretation of relevant physical evidence (or the lack of it) is the sort of neutral, disinterested testimony that may well tip the scales and sway the fact-finder. . . . Because of the importance of physical evidence in credibility contest sex abuse cases, in such cases physical evidence should be a focal point of defense counsel's pre-trial investigation and analysis of the matter. And because of the vagaries of abuse indicia, such pre-trial investigation and analysis will generally require some consultation with an expert." (Citations omitted; internal quotation marks omitted.) Id., 224; see also *Gersten* v. *Senkowski*, supra, 426 F.3d 608–609 ("[W]e have explained that medical expert consultation or testimony is particularly critical to an effective defense in sexual abuse cases where direct evidence is limited to the victim's testimony. . . . But in a case where the only direct evidence that any crime occurred or that, if it did, the petitioner committed it, was the testimony of the alleged victim, for defense counsel to simply concede the medical evidence without any investigation into whether it could be challenged was performance that the state court could not reasonably find to be objectively reasonable. . . . We do not even mean to hold that expert consultation is always necessary in order to provide effective assistance of counsel in child sexual abuse cases—we need not address the issue in such generality . . . ." [Citations omitted.]); *Eze* v. *Senkowski*, 321 F.3d 110, 128 (2d Cir. 2003) ("A lesson to be learned . . . is that when a defendant is accused of sexually abusing a child and the evidence is such that the case will turn on accepting one party's word over the other's, the need for defense counsel to, at a minimum, consult with an expert to become educated about the 'vagaries of abuse indicia' is critical. . . . The

importance of consultation and pre-trial investigation is heightened where . . . the physical evidence is less than conclusive and open to interpretation." [Citation omitted.]); *Lindstadt* v. *Keane*, supra, 239 F.3d 202 ("defense counsel's failure to consult an expert, failure to conduct any relevant research, and failure even to request copies of the underlying studies relied on by [prosecution's expert witness] contributed significantly to his ineffectiveness").

Taken together, *Michael T.* and the cases cited from the United States Court of Appeals for the Second Circuit, demonstrate that cases involving child sexual abuse may, depending on the circumstances, require some pretrial investigation and consultation with expert witnesses. We note, however, that in the cases cited previously, where courts have determined that counsel was ineffective, trial counsel did not consult with an expert before the defendants' criminal trials. See *Michael T.* v. *Commissioner of Correction*, supra, 122 Conn. App. 420 (trial counsel only cross-examined state's witnesses and did not request funding for expert testimony for petitioner); *Gersten* v. *Senkowski*, supra, 426 F.3d 607–608 ("Here, defense counsel failed to call as a witness, or even to consult in preparation for trial and cross-examination of the prosecution's witnesses, any medical expert on child sexual abuse. Counsel essentially conceded that the physical evidence was indicative of sexual penetration without conducting any investigation to determine whether this was the case."); *Pavel* v. *Hollins*, supra, 261 F.3d 223 (court noted that counsel's decision not to provide expert testimony was deficient in part "because it was not based on pre-trial consultation with such an expert"); *Lindstadt* v. *Keane*, supra, 239 F.3d 201 ("there is no evidence that defense counsel contacted an expert, either to testify or [at

least] to educate counsel on the vagaries of abuse indicia").

In the present case, McQuillan did consult with two experts in the relevant fields. When McQuillan received the results of the victim's physical examination, he shared those results with Rau, who apprised McQuillan that a normal examination could be consistent with child sexual abuse. McQuillan again consulted with Rau after Murphy testified and Rau informed McQuillan that his testimony would be the same as Murphy's testimony—that a child who had suffered sexual abuse could have a normal physical examination. As a result, McQuillan decided not to present Rau's testimony. The petitioner, however, contends that McQuillan should have sought another medical expert to testify concerning the victim's physical examination because there was contrary medical evidence available at the time of trial. A trial attorney is entitled to rely reasonably on the opinion of an expert witness; see *Doehrer* v. *Commissioner of Correction*, 68 Conn. App. 774, 783, 795 A.2d 548, cert. denied, 260 Conn. 924, 797 A.2d 520 (2002); and is not required to continue searching for a different expert. See *Santiago* v. *Commissioner of Correction*, 90 Conn. App. 420, 426, 876 A.2d 1277 (counsel was entitled to rely on expert opinion when determining that petitioner did not suffer from mental defect, and was not required to "seek an indeterminate number of expert opinions" before concluding that petitioner did not suffer from mental defect or disease), cert. denied, 275 Conn. 930, 883 A.2d 1246 (2005), cert. denied sub nom. *Santiago* v. *Lantz*, 547 U.S. 1007, 126 S. Ct. 1472, 164 L. Ed. 2d 254 (2006). We cannot conclude that McQuillan's performance was deficient when he consulted with an expert witness regarding the victim's physical examination, yet reasonably concluded not to use the expert witness at trial after determining that

such testimony would not benefit the petitioner's defense.

As for the petitioner's contention that McQuillan rendered ineffective assistance of counsel when he failed to consult with experts in the field of child sexual abuse, we reach the same conclusion. McQuillan consulted with Zeman prior to the petitioner's criminal trial. After being provided the victim's records, Zeman apprised McQuillan that everything in the records was consistent with someone who had been sexually abused as a child. McQuillan testified at the petitioner's habeas trial that he believed that if he called Zeman as a witness and introduced the victim's records into evidence, he would open the door to the prosecution to elicit testimony that the victim's behavior was consistent with sexual abuse. McQuillan, accordingly, reasonably chose not to present the testimony of Zeman or to introduce the victim's records into evidence. The petitioner, however, contends that Mantell's testimony demonstrates that there was an alternative explanation for most of the behaviors exhibited by the victim, and such alternative explanations should have been presented to the jury.

By consulting with Zeman, McQuillan engaged in the requisite level of pretrial investigation and consultation to inform himself about the " 'vagaries of abuse indicia' . . . ." *Eze* v. *Senkowski, supra,* 321 F.3d 128. He affirmatively consulted with an expert in a relevant field, who apprised him that the victim's records were consistent with sexual abuse. McQuillan was entitled to rely reasonably on the opinion of Zeman and was not required to continue searching for a different expert. See *Santiago* v. *Commissioner of Correction, supra,* 90 Conn. App. 426.

Furthermore, trial counsel is entitled to make strategic choices in preparation for trial. See *Johnson* v. *Commissioner of Correction,* 222 Conn. 87, 96, 608 A.2d

667 (1992), quoting *Strickland* v. *Washington*, supra, 466 U.S. 690, 689 ("strategic choices made after thorough investigation of [the] law and facts relevant to plausible options are virtually unchallengeable" and "the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy" [internal quotation marks omitted]).

As for the physical evidence in the petitioner's criminal case, McQuillan sufficiently cross-examined Murphy regarding the likelihood that a young female child, who suffered years of alleged abuse, would have a normal physical examination. See *Thompson* v. *Commissioner of Correction*, supra, 131 Conn. App. 696 (court determined that where trial counsel elicited necessary testimony from prosecution's witnesses, he did not render ineffective assistance by choosing not to present expert witness). McQuillan cross-examined Murphy as follows:

"[McQuillan]: Ms. Murphy, I'm going to ask you to assume the following: That if you are going to do an examination of a child who is approximately nine and one-half, ten years old, female, who comes in with a history of alleging sexual abuse from the age of four, five up until approximately one month prior to your doing this examination; that this child alleges that she was sexually abused on an almost weekly basis during that entire four to five year period; and that she also alleges or claims that during that entire four to five year period on a weekly basis that she had penile to vaginal intercourse and her description is that it was all the way into her; that he pushed his penis and then pushed it further and further and until it was all the way into her; and that this was done on a weekly basis for four to five years; and also on some occasions that there would also be digital, with fingers, penetration also

claimed into the vaginal area. Based on that hypothetical, in your physical examination, would you expect to see any evidence of physical trauma to the hymen? . . .

"[Murphy]: I've been doing this for a long time and I'm just—I see so many normal exams when I hear histories like that that I don't ever go in expecting to see something. Certainly, to have multiple penetrations does increase the possibility that you will see some sort of injury or some sort of mark but not necessarily. Typically, when I had had abnormal exams, the children report bleeding. I didn't learn that information here.

"[McQuillan]: There is no history of bleeding given to you?

"[Murphy]: That's—that's correct.

"[McQuillan]: In the specific case of [the victim]?

"[Murphy]: That's correct. But usually you do hear— you can have children who experience multiple episodes of that and they have a normal exam. When I've seen abnormal exams, typically you will hear them describe bleeding.

"[McQuillan]: Okay. Given that same hypothetical—

"[Murphy]: Uh-huh.

"[McQuillan]: —if a child, female child is penetrated repeatedly over that period of time, four to five year period of time on a weekly basis, assuming that's the case—

"[Murphy]: Uh-huh.

"[McQuillan]: —would you expect there to be some wearing away of the hymenal tissue or other evidence to show penetration? . . .

"[Murphy]: It's hard to predict how the tissue will sort of be affected by that. I think just like anybody

who experiences—skins their knee, some people it will heal where there is nothing, you know, there is no mark of it; some people will have a huge scar. It's just such an individual thing. It's hard to sort of, you know, guess on what you would imagine. And I've seen so many normal exams when there is some very significant history there. So, I've just learned to know—you, know, I just sort of focus in on what I know is something where it truly is abnormal."

Through Murphy's testimony, McQuillan attempted to illustrate the apparent inconsistencies in regard to the victim's story and her physical examination.[6] Instead of providing duplicative testimony, McQuillan chose to cross-examine Murphy to point out the apparent inconsistencies with the victim's allegations of years of routine abuse with her physical examination. We conclude that McQuillan's decision was properly based on sound legal strategy.

As for McQuillan's decision not to present the testimony of Zeman at the criminal trial, we again conclude that his decision was grounded in sound legal strategy. McQuillan decided not to present the testimony of Zeman, for fear of not only producing duplicative testimony, but also of opening the door to the prosecution to elicit testimony that may have been harmful to the

---

[6] We also note that McQuillan sufficiently pointed out the lack of physical evidence in his closing argument: "[The victim] testified that [the petitioner] pushed his penis inside her and then pushed more, then pushed more and this happened every time. She also testified that he penetrated her vagina with his fingers. Despite this testimony by [the victim] about vaginal intercourse and the fact that he pushed and pushed and pushed and that happened every time, despite that testimony, the nurse from Yale, Janet Murphy, testified that her physical exam was completely normal. Despite hundreds—again, you can add it up yourself—of incidences of vaginal penetration of a child the ages of four to nine, there is no physical evidence that that actually occurred. This is the one piece of evidence that does not rely upon credibility. It is the only physical evidence in this trial and the conclusion is that the vaginal exam was normal."

petitioner's case. See *Vines* v. *Commissioner of Correction*, 94 Conn. App. 288, 296–97, 892 A.2d 312 (court found there was "sufficient tactical basis" for counsel's decision not to call witness when counsel determined that testimony would not benefit petitioner), cert. denied, 278 Conn. 922, 901 A.2d 1222 (2006); *Chace* v. *Bronson*, 19 Conn. App. 674, 681, 564 A.2d 303 (court determined that trial counsel's decision not to present eyewitness testimony was within "range of reasonable trial tactics" when "any benefit that might have inured to the petitioner from [the] testimony would be outweighed by the deleterious effect of other unfavorable testimony [the witness] might be called upon to give"), cert. denied, 213 Conn. 801, 567 A.2d 832 (1989). Because McQuillan consulted with two experts in relevant fields and made reasonable strategic choices at the petitioner's criminal trial, we conclude that the court properly denied the petition for a writ of habeas corpus.

The judgment is affirmed.

In this opinion the other judges concurred.