******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# MICHAEL ERVIN *v.* COMMISSIONER OF CORRECTION
## (AC 41763)

Elgo, Devlin and Sheldon, Js.

*Syllabus*

The petitioner, who had been convicted of the crime of murder in connection with the death of his wife, sought a writ of habeas corpus. He claimed, inter alia, that his trial counsel, M, rendered ineffective assistance to him by failing to present the testimony of an independent defense forensic pathologist to rebut the testimony of the state's chief medical examiner, C, as to the cause of the victim's death, and by presenting an inadequate argument in support of his posttrial motion for a judgment of acquittal. C determined that the cause of the victim's death was traumatic asphyxia due to neck compression, and C testified at trial that the cause of death was consistent with a certain type of wrestling hold previously used by the petitioner. M hired as a defense consultant a forensic pathologist, T, who previously had concluded that the victim's injuries were consistent with a choke hold neck compression, although T could not rule out choking on food as a cause of death. In subsequent discussions, C and T each explained to M that the presence of food in the victim's mouth was probably the result of agonal regurgitation, i.e., vomit expelled as the body ceases to function. T also informed M that he believed that his testimony would be unhelpful for the defense and suggested that the petitioner consider a plea disposition. The habeas court rendered judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Held*:

1. The petitioner's claim that M rendered ineffective assistance of counsel to him by failing to present expert testimony from an independent forensic pathologist to refute C's testimony as to the cause of the victim's death was unavailing; M sought out the opinion of a highly trained and experienced forensic pathologist, T, on which he was entitled to rely, and, although M made the strategic decision not to call T as a defense witness after T told M that he would not be helpful as a trial witness because he agreed with the opinion of C, M did request and receive valuable information from T, which he used in his cross-examination of C, and M was not required to search for a different, more favorable expert than T to contradict C's testimony at trial.

2. The petitioner could not prevail on his claim that M rendered ineffective assistance of counsel at his criminal trial by presenting an inadequate argument in support of his motion for a judgment of acquittal and, specifically, that M failed to argue that, on the basis of the evidence presented at trial, the state could not prove the essential element of intent to kill because it could not disprove an alternative hypothesis, that he had caused the victim's death inadvertently by applying compression to her neck without intending to cause her death: M's decision not to base the petitioner's defense on the theory of inadvertent death by neck compression without intent to kill was neither professionally inappropriate nor constitutionally deficient under the circumstances, as there was no physical evidence at the crime scene of any physical struggle between the petitioner and the victim, and M raised that theory with the petitioner for the purpose of having him consider relying on it but the petitioner adamantly refused to do so, for he was aware that by raising that defense he would have to admit and argue certain important and highly incriminating facts that he vehemently denied, and M, faced with the petitioner's denial, understandably avoided any mention of that theory when he argued the petitioner's posttrial motion for a judgment of acquittal, which also avoided the possibility that the jury might be instructed on, and thus might find the petitioner guilty of, a lesser included offense instead of acquitting him entirely if it had reasonable doubt as to his alleged intent to kill; moreover, the petitioner could not prevail on his claim that he was prejudiced because a properly argued motion for a judgment of acquittal would probably have led the trial court to grant the motion on the theory that there was insufficient

evidence before the jury to prove that he had acted with the intent to kill the victim, as there was more than ample evidence in the record to support the inference that the petitioner had intentionally killed the victim, and such evidence supported the complementary inferences that the petitioner had the motive, the means and the opportunity to kill the victim.

Argued October 8, 2019—officially released February 11, 2020

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *Sferrazza, J.*; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*James J. Ruane*, assigned counsel, for the appellant (petitioner).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Michael L. Regan*, state's attorney, and *Paul J. Narducci*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

SHELDON, J. In this certified appeal from the habeas court's denial of his amended petition for a writ of habeas corpus, the petitioner, Michael Ervin, claims that the court erred in rejecting his claim that his trial counsel rendered ineffective assistance to him in his criminal trial for the murder of his wife (victim)[1] (1) by failing to call a defense pathologist to rebut the testimony of the state's chief medical examiner, Harold Wayne Carver, as to the cause of the victim's death and/or (2) by presenting an inadequate argument in support of his motion for a judgment of acquittal. We affirm the judgment of the habeas court.

In reviewing the petitioner's claims on direct appeal from his conviction, this court set forth the following facts, which were adopted by the habeas court. "On March 14, 2002, at approximately 10 p.m., Norwich police and emergency personnel, who had been dispatched to [the petitioner's home], discovered the unresponsive body of the victim . . . on the kitchen floor. Measures to revive the victim were unsuccessful. The victim had no visible signs of injury, no cuts or abrasions and no pulse. The [petitioner] was kneeling on the floor next to the victim, and he had no external injuries on him. Police found no signs of a forced entry or struggle. A paramedic had difficulty opening the victim's airway because there was a substantial amount of vomit as well as particles of food in her mouth. Eventually, the victim was transported to a hospital where she was pronounced dead at approximately 11 p.m.

"The medical examiner determined the cause of death to be traumatic asphyxia due to neck compression. During the trial, the medical examiner viewed a demonstration videotape showing a certain type of wrestling hold once used by the [petitioner] and testified that the cause of death was consistent with such a hold. The [petitioner] stated to the police that the victim had been fine when he left her earlier in the evening. He returned to the home with his occasional fishing companion, Michael Hancin, and found the victim on the floor where he attempted to revive her." *State* v. *Ervin*, 105 Conn. App. 34, 36–37, 936 A.2d 290 (2007), cert. denied, 285 Conn. 918, 943 A.2d 475 (2008). The jury found the petitioner guilty of murder in violation of General Statutes § 53a-54a (a), for which the trial court sentenced him to a term of sixty years incarceration. Thereafter, this court affirmed the petitioner's conviction on direct appeal. Id., 36.

On July 24, 2014, the petitioner filed a petition for a writ of habeas corpus. By way of an amended petition filed on November 28, 2017, the petitioner claimed, inter alia, that his trial counsel, Bruce McIntyre, rendered ineffective assistance to him in two ways: first, by failing to present the testimony of an independent defense

pathologist to rebut the testimony of Carver as to the cause of the victim's death; and second, by presenting an inadequate argument in support of his posttrial motion for a judgment of acquittal.

On April 24, 2018, after a multiday trial, the habeas court issued a memorandum of decision denying the petitioner's petition. As to each claim, the court found that the petitioner had failed to prove either that his trial counsel's performance was constitutionally deficient or that he had been prejudiced by such allegedly deficient performance. The habeas court made the following relevant factual findings in its memorandum of decision. "Attorney McIntyre was the third attorney appointed to represent the petitioner, having been preceded by public defenders Elizabeth Inkster and Kevin Barrs. His predecessors had consulted and retained a forensic pathologist, Dr. Mark Taff. Dr. Taff was a highly trained and experienced forensic pathologist who had been a medical examiner for Wayne County, Michigan, which includes the city of Detroit. Both Attorneys Inkster and Barrs had employed Dr. Taff as a defense consultant in the past, as had Attorney McIntyre.

"When consulted by Attorney Inkster in 2003, Dr. Taff reviewed the materials pertinent to the petitioner's case. Dr. Taff concurred with Dr. Carver that the victim's injuries were consistent with choke hold neck compression, although Dr. Taff could not rule out choking on food as a cause of death. Attorney McIntyre reviewed Dr. Taff's report and rehired Dr. Taff as a defense consultant on behalf of the petitioner.

"Attorney McIntyre also discussed the petitioner's case with Dr. Carver on two occasions, including one discussion that took several hours. Attorney McIntyre also spoke with Dr. Taff a few days before the petitioner's trial began. Dr. Taff explained that, while he found the evidence as to cause of death equivocal, it was consistent with application of a sleeper hold. Dr. Taff also informed Attorney McIntyre that he believed [that] his testimony would be unhelpful for the defense and suggested that the petitioner consider a plea disposition.

"Attorney McIntyre possessed an advantage over most defense lawyers because he had been a military policeman, a Hartford police officer, and a Connecticut state trooper for twenty years. With all three law enforcement agencies, he received specialized training in restraint holds and understood that one had to release a subject to such a hold within seven seconds to avoid serious harm.

"Soon after receiving assignment of the petitioner's case, Attorney McIntyre reviewed all the material connected with the case, including Dr. Carver's autopsy report. Attorney McIntyre educated himself in the area of neck compression asphyxia by [reading] salient por-

tions of [a forensic pathology text] and conducting internet research. As a result, Attorney McIntyre rehired Dr. Taff.

"In his discussions with Dr. Carver, Attorney McIntyre inquired about the significance of the absence of forced entry and the warmth of the victim's body. Dr. Carver explained that the presence of food in the victim's mouth was probably the result of agonal regurgitation, i.e., vomit expelled as the body ceases to function.

"When he consulted Dr. Taff, Attorney McIntyre revisited these topics. They explored the viability of possible alternative explanations for Dr. Carver's observations. Dr. Taff agreed with Dr. Carver's assessment of agonal regurgitation and with the presence and significance of petechial hemorrhages on the victim's body.

"Attorney McIntyre also conferred with Dr. Taff on occasion during the petitioner's criminal trial. Attorney McIntyre was impressed by Dr. Taff's abilities and considered his opinions and advice to be very competent, direct, and useful. Attorney McIntyre has retained Dr. Taff on other cases since the petitioner's trial. Dr. Taff suggested to Attorney McIntyre several areas for cross-examination of Dr. Carver, which information Attorney McIntyre explored in the examination, including the fact that female tissue will often display injury when subjected to less force than needed to produce that effect in males, that the injuries that Dr. Carver detected were very subtle, that these injuries are not diagnostic for neck compression, that Dr. Carver never examined the victim's soft tissue microscopically, and that vigorous CPR can, itself, cause petechial hemorrhaging."

On the basis of the foregoing factual findings and credibility determinations, the habeas court, in addressing the petitioner's ineffective assistance claim regarding the failure to call an expert pathologist, stated that trial counsel "was entitled to rely on the opinion of Dr. Taff because that reliance was reasonable" and cited to Dr. Taff's credentials. The court further stated that even if counsel had presented "expert testimony . . . the jury would still have had the opportunity to assess whether the other evidence in the case . . . supported the opinion of the chief medical examiner . . . . [I]mportantly, the petitioner grossly downplays the devastating evidence [introduced at trial]." The court summarized such "devastating evidence" as follows: "[E]vidence of the petitioner's intense desire to remove the victim from his life, his wish to make [Dee Anne] Champlin the 'next mother' of his children, his ability to execute the sleeper hold, and his peculiarly deceitful and evasive behavior on the night of the victim's death and the following day. The fact that . . . Champlin began staying at the petitioner's home within a few weeks of the victim's death belies the petitioner's statements to [the] police that he never intended to live with Champlin."[2]

In addressing the petitioner's claim that counsel presented inadequate argument on the motion for a judgment of acquittal, the habeas court concluded that the state had presented sufficient evidence, apart from Dr. Carver's expert opinion as to the cause of the victim's death, to establish that the petitioner had caused her death while acting with the intent to kill. It summarized such evidence, more particularly, as follows:

"As to the identity of the perpetrator, the crime scene contained no evidence of forced entry or signs of a struggle. The petitioner had locked the door to the home when he left for the marina and needed to unlock the door when he returned with Hancin. . . .

"[As to the petitioner's alleged intent to kill, the] jury could have determined that the petitioner engaged in several peculiar actions the evening of [the victim's] demise and the following day that comprised indicia of guilt. He was supposed to join [Champlin] at her home around 6:30 p.m., and reiterated his intent to do so, while simultaneously arranging to meet with Hancin at 5:30 p.m., to fish at the marina. When he finally arrived at the marina, at 9:30 p.m., he had no fishing gear. The petitioner then proceeded to badger Hancin to go to the petitioner's house to practice shooting darts, despite Hancin's vocal and obvious disinclination to do so because he needed to return to his home by 11 p.m. The petitioner's agitated insistence led Hancin to accede to the petitioner's demands.

"The petitioner then drives home, followed by Hancin, in an inordinately slow fashion. They enter the petitioner's house, and Hancin sits in the living room preparing his three darts for throwing, which preparation takes approximately one minute per dart. Throughout this time, the petitioner was in the kitchen, where [the] unconscious and nonresponsive [victim] lay sprawled on the floor. Hancin thought it strange that the petitioner took minutes, rather than seconds, to summon his assistance.

"Upon seeing the victim on the floor, Hancin urged the petitioner to call 911 several times, but each time the petitioner failed to do so. Hancin ended up using the petitioner's house phone to call 911. When Hancin asked the petitioner for the address, again the petitioner appeared to stall. When Hancin attempted to revive the victim, the petitioner pushed him away and took over and immediately stuck his fingers into the victim's mouth and extracted a large quantity of food. The jury could reasonably infer that the petitioner had engaged in procuring Hancin's presence at the house to stage the scene for when the petitioner first seemed to discover [the victim's] body.

"Also, the petitioner lied to the police about several matters when the police interviewed him the next day. He denied ever having plans to meet with . . . Champ-

lin the evening before. He stated [that] his marriage was 'very good' and that he and [the victim] 'got along great.' He claimed that he asked Hancin to call 911 and that he was the first person to initiate CPR. He acknowledged having had an affair but one that only lasted a couple of months and had ended about a year earlier. He claimed that he never intended to live with Champlin and had merely agreed to help her move into her new apartment.

"The jury also heard evidence from multiple witnesses that his relationship with Champlin had never ceased; that he was supposed to meet with her on the evening of [the victim's] death; that Champlin had been pressuring him to fulfill his repeated promises to leave [the victim] so that the petitioner and Champlin could live together; that the petitioner had recently opened a joint checking account and savings account with Champlin; that he and Champlin applied for rental of an apartment together; that he and Champlin were scheduled to move to that apartment two days after [the victim's] death; and that the apartment was chosen because it was large enough to accommodate the petitioner's two children. Most significantly, the petitioner had made statements to Hancin that he intended to live with Champlin, who would be his children's next mother, and that he had to get rid of [the victim]."

On the basis of that evidence, the habeas court concluded that "the jury had before it abundant evidence, in *conjunction* with Dr. Carver's testimony, to find, beyond a reasonable doubt, that the victim's death resulted from the petitioner's intentional acts to produce that outcome." (Emphasis in original.) It therefore denied the petitioner's amended petition for a writ of habeas corpus. The petitioner timely filed a petition for certification to appeal, which was granted. This appeal followed. Additional facts and procedural history will be set forth as necessary.

On appeal, the petitioner claims that the habeas court erred in determining that he had failed to prove that his trial counsel's performance was constitutionally deficient either in failing to present expert testimony from an independent pathologist to rebut the medical examiner's testimony as to the cause of the victim's death or in presenting an inadequate argument in support of his motion for a judgment of acquittal. We disagree.

We begin our review of the habeas court's rulings by setting forth the standard of review applicable to and the substantive law governing the petitioner's underlying claims. "The habeas court is afforded broad discretion in making its factual findings, and those findings will not be disturbed unless they are clearly erroneous. . . . Historical facts constitute a recital of external events and the credibility of their narrators. . . . Accordingly, [t]he habeas judge, as the trier of facts, is

the sole arbiter of the credibility of witnesses and the weight to be given to their testimony. . . . The application of the habeas court's factual findings to the pertinent legal standard, however, presents a mixed question of law and fact, which is subject to plenary review. . . .

"[I]t is well established that [a] criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, [466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)]. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. . . . As enunciated in *Strickland* . . . this court has stated: It is axiomatic that the right to counsel is the right to the effective assistance of counsel. . . . A claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . The claim will succeed only if both prongs are satisfied. . . . *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 677–78, 51 A.3d 948 (2012). A court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong, whichever is easier. *Washington* v. *Commissioner of Correction*, 287 Conn. 792, 832–33, 950 A.2d 1220 (2008)." (Internal quotation marks omitted.) *Thomas* v. *Commissioner of Correction*, 141 Conn. App. 465, 470–71, 62 A.3d 534, cert. denied, 308 Conn. 939, 66 A.3d 881 (2013).

I

The petitioner first claims that his trial counsel rendered ineffective assistance to him by failing to present expert testimony from an independent pathologist to refute Dr. Carver's testimony as to the cause of the victim's death. Specifically, the petitioner contends that counsel should have presented an expert pathologist to testify that the victim's death was caused by choking on food, not by traumatic asphyxia due to neck compression. The respondent, the Commissioner of Correction, disagrees, contending that counsel reasonably relied on his consultation with Dr. Taff to cross-examine Dr. Carver, and that he was not required to search for a different, more favorable expert than Dr. Taff to contradict Dr. Carver's testimony at trial. We agree with the respondent.

"A trial attorney is entitled to rely reasonably on the

opinion of an expert witness; see *Doehrer* v. *Commissioner of Correction*, 68 Conn. App. 774, 783, 795 A.2d 548, cert. denied, 260 Conn. 924, 797 A.2d 520 (2002); and is not required to continue searching for a different expert [or for multiple experts once he has done so]." *Stephen S.* v. *Commissioner of Correction*, 134 Conn. App. 801, 816, 40 A.3d 796, cert. denied, 304 Conn. 932, 43 A.3d 660 (2012); see id., 816–17 ("[w]e cannot conclude that [counsel's] performance was deficient when he consulted with an expert witness regarding the victim's physical examination, yet reasonably concluded not to use the expert witness at trial after determining that such testimony would not benefit the petitioner's defense"); see also *Santiago* v. *Commissioner of Correction*, 90 Conn. App. 420, 426, 876 A.2d 1277, cert. denied, 275 Conn. 930, 883 A.2d 1246 (2005), cert. denied sub nom. *Santiago* v. *Lantz*, 547 U.S. 1007, 126 S. Ct. 1472, 164 L. Ed. 2d 254 (2006).

Furthermore, "[t]here is no per se rule that requires a trial attorney to seek out an expert witness. . . . Where trial counsel has consulted with such experts, however, but made the tactical decision not to produce them at trial, such decisions properly may be considered strategic choices." (Citation omitted; internal quotation marks omitted.) *Santos* v. *Commissioner of Correction*, 151 Conn. App. 776, 785, 96 A.3d 616 (2014).

In the present matter, trial counsel sought out Dr. Taff's opinion, on which he was entitled to rely. Dr. Taff was a "highly trained and experienced forensic pathologist . . . ." After discussing the matter with counsel, Dr. Taff told counsel that he would not be helpful as a trial witness because he agreed with the opinion of Dr. Carver. On that basis, counsel made the strategic decision not to call Dr. Taff as a defense witness. Even so, he did request and receive valuable information from Dr. Taff, which he used in his cross-examination of Dr. Carver. The fact that it took the jury five days to deliberate before returning a verdict speaks to the effectiveness of counsel's cross-examination.

On the basis of this evidence as to counsel's efforts to contest the cause of the victim's death at trial, the petitioner failed to demonstrate deficient performance on the part of counsel based on his decision not to recruit or present the testimony of another expert pathologist.

## II

The petitioner next claims that his counsel rendered ineffective assistance at his criminal trial by presenting an inadequate argument in support of his motion for a judgment of acquittal. In his appellate brief, he argues that trial counsel's performance in arguing the motion was constitutionally deficient because counsel failed to argue that, on the basis of the evidence presented at trial, the state could not prove the essential element

of intent to kill because it could not disprove an alternative hypothesis, also assertedly raised by the evidence, that he had caused the victim's death inadvertently by applying compression to her neck without intending to cause her death.[3] The petitioner claims that if counsel had argued his motion on that basis, the trial court "likely" would have granted the motion, and thereby ordered his acquittal on the charge of murder.[4] The respondent contends that the petitioner's argument is completely devoid of merit, both because counsel's performance in basing his argument solely on the only defense theory approved by the petitioner and presented at trial—that the victim had died from accidentally choking on food—was professionally appropriate, and because such performance could not have prejudiced the petitioner due to the abundance of other evidence before the jury supporting the inference that the petitioner had the intent to kill the victim. We agree with the respondent that the petitioner failed to prove either the performance prong or the prejudice prong of this aspect of his ineffective assistance of counsel claim.

Practice Book § 42-40 provides in relevant part: "After the close of the prosecution's case-in-chief or at the close of all the evidence, upon motion of the defendant or upon its own motion, the judicial authority shall order the entry of a judgment of acquittal as to any principal offense charged and as to any lesser included offense for which the evidence would not reasonably permit a finding of guilty. Such judgment of acquittal shall not apply to any lesser included offense for which the evidence would reasonably permit a finding of guilty." On a motion for a judgment of acquittal, "[t]he issue to be determined is whether the jury could have reasonably concluded, from the facts established and the reasonable inferences which could be drawn from those facts, that the cumulative effect was to establish guilt beyond a reasonable doubt . . . ." (Internal quotation marks omitted.) *State* v. *Balbuena*, 168 Conn. App. 194, 199, 144 A.3d 540, cert. denied, 323 Conn. 936, 151 A.3d 384 (2016).

"The standard of review we apply to a claim of insufficient evidence is well established. In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . .

If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Campbell*, 328 Conn. 444, 503–504, 180 A.3d 882 (2018).

It is important to note that, "[i]n evaluating evidence, the trier of fact is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The trier may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical." (Internal quotation marks omitted.) *State* v. *Balbuena*, supra, 168 Conn. App. 199.

"[T]he state of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually [proven] by circumstantial evidence . . . ." (Internal quotation marks omitted.) *State* v. *Bonilla*, 317 Conn. 758, 766, 120 A.3d 481 (2015). "Intent to cause death may be inferred from the type of weapon used, the manner in which it was used, the type of wound inflicted and the events leading to and immediately following the death." (Internal quotation marks omitted.) *State* v. *Campbell*, supra, 328 Conn. 504.

Here, the petitioner argues that trial counsel should have argued inadvertent death by neck compression and emphasized the lack of evidence to establish the element of intent. He asserts that he was prejudiced by counsel's failure to so argue the motion because, had the motion been so argued, it is likely that the trial court would have granted it, and thereby acquitted him of murder. We disagree.

To prove the performance prong of this second aspect of his ineffective assistance of counsel claim, the petitioner claims, impliedly, that whenever the evidence presented at trial raises doubt as to an essential element of a charged offense, it is unprofessional for counsel not to take advantage of that insufficiency by pointing it out to the trial court and arguing it as a basis for ordering a judgment of acquittal. This case, however, provides an excellent example of why that otherwise logical proposition is not invariably true. Here, defense counsel was well aware of the inadvertent death by neck compression theory of the defense and, in fact, had raised it with the petitioner for the purpose of having him consider relying on it. The petitioner, however, adamantly refused to do so, for he was aware that by raising that defense he would have to admit and

argue two important and highly incriminating facts that he vehemently denied: first, that he was present in the family home when the victim died; and second, that her death had resulted from his application of a sleeper hold to her neck, albeit without the intent to cause her death. Counsel, faced with his client's denial, understandably avoided any mention of that theory of the case when he argued the petitioner's posttrial motion for a judgment of acquittal. In so doing, moreover, he also avoided the possibility that the jury might be instructed on and thus might find the petitioner guilty of a lesser included offense, such as manslaughter or negligent homicide, instead of acquitting him entirely if it had reasonable doubt as to his alleged intent to kill. For these reasons, and because there was no physical evidence at the crime scene of any physical struggle between the petitioner and the victim, we conclude that counsel's decision not to base the petitioner's defense or his motion for a judgment of acquittal on the theory of inadvertent death by neck compression without intent to kill was neither professionally inappropriate nor constitutionally deficient.

On this second aspect of the petitioner's ineffective assistance of counsel claim, as on the first, we are not required to address the issue of prejudice in light of our determination that the petitioner failed to prove the performance prong of the claim. *Strickland* v. *Washington*, supra, 466 U.S. 687. We will do so, however, to clarify two matters. First, since the gravamen of the petitioner's claim of prejudice is that a properly argued motion for a judgment of acquittal would probably have led the trial court to grant the motion on the theory that there was insufficient evidence before the jury to prove that he had acted with the intent to kill the victim, we agree with the habeas court that there was more than ample evidence in the record to support the inference that the petitioner had intentionally killed the victim. Such evidence, more particularly, supports complementary inferences that the petitioner had the motive, the means, and the opportunity to kill the victim. As to motive, the jury was presented with witness testimony that the petitioner had wanted to "get rid of his wife," and that his girlfriend, Champlin, "would be his children's next mother . . . ." Multiple witnesses testified that the petitioner had stated that he intended to leave the victim, and, shortly after the victim's death, the petitioner and Champlin moved in together. Moreover, prior to the victim's death, the petitioner and Champlin had confirmed their intent to live together by signing a joint lease and opening a joint bank account. This alone was overwhelming circumstantial evidence of the petitioner's motive, and thus of his intent, to murder the victim.

As to means, the evidence showed that the petitioner could easily have applied a sleeper hold to the victim because he knew how to apply such a hold and had

been seen doing so to another person at least once in the past. As to opportunity, the jury had heard testimony that there were several hours of time that were unaccounted for between when the petitioner was supposed to have joined his friend, Hancin, at the marina to go fishing and the time he actually arrived there, unprepared to go fishing and unaccountably insistent on returning to his home for the stated purpose of playing darts. Such evidence, coupled with the petitioner's unusual behavior in Hancin's presence after persuading Hancin to return with him to his home—including delaying both the giving of first aid and the summoning of rescue personnel despite the victim's obviously distressed condition, which showed a degree of unconcern about her condition and ultimate fate—well supported the inference that he wanted and expected the victim to die. In light of this evidence, the petitioner failed to prove that there was a reasonable likelihood that his motion for a judgment of acquittal would have been granted had his trial counsel argued it differently.

In light of the facts presented at trial, summarized as aforesaid, trial counsel performed well within the bounds of competent representation and did not need to argue inadvertent death as a theory in support of the petitioner's motion for a judgment of acquittal.

For the foregoing reasons, we conclude that the habeas court properly denied the petitioner's amended petition for a writ of habeas corpus.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of victims of family violence, we decline to use the victim's name.

[2] A detailed description of the evidence is set forth in part II of this opinion.

[3] In his principal brief, the petitioner argues that trial counsel should have argued that the evidence presented at trial was insufficient to prove him guilty of murder because it did not disprove beyond a reasonable doubt that the victim had suffered an "inadvertent death" by neck compression. The brief explains that inadvertent death by neck compression means "neck compression without intent to kill." (Internal quotation marks omitted.) To put this language into context, the brief argues more specifically that trial counsel should have argued that the petitioner choked the victim and caused her death but did not do so with the intent to cause her death.

During oral argument, however, the petitioner's appellate counsel abandoned the foregoing argument and contended, instead, that, on the facts of this case, as presented by the state at trial, defense counsel had two ways of defending this case: (1) offering an alibi, which he admittedly did not have, or (2) arguing that the victim's death had not been caused by criminal means but had, instead, been accidental. When asked what he meant by the term "accidental," appellate counsel stated that "accidental" means "choking."

We elect to address the merits of the petitioner's claim based on the theory argued in his principal brief: "neck compression without intent to kill." (Internal quotation marks omitted.)

[4] The petitioner also argues that trial counsel was ineffective in failing to request a jury instruction on the lesser included offense of manslaughter. However, this issue was not raised in the habeas court, and, therefore, it cannot be raised for the first time on appeal. See *Lewis* v. *Commissioner of Correction*, 165 Conn. App. 441, 444 n.2, 139 A.3d 759, cert. denied, 322 Conn. 901, 138 A.3d 931 (2016).